GUARDIANS ASSOCIATION ET AL. *v.* CIVIL SERVICE
COMMISSION OF THE CITY OF NEW YORK ET AL.

No. 81–431.   Argued November 1, 1982—Decided July 1, 1983

*Christopher Crowley* argued the cause for petitioners. With him on the briefs was *Kenneth Kimerling*.

*Leonard Koerner* argued the cause for respondents. With him on the brief was *Frederick A. O. Schwarz, Jr.**

---

*Briefs of *amici curiae* urging reversal were filed by *Arthur N. Eisenberg* and *E. Richard Larson* for the American Civil Liberties Union et al.; and by *Vilma S. Martinez, Morris J. Baller,* and *Roger L. Waldman* for the Asian American Legal Defense and Education Fund et al.

*Robert E. Williams, Douglas S. McDowell,* and *Thomas R. Bagby* filed a brief for the Equal Employment Advisory Council as *amicus curiae* urging affirmance.

JUSTICE WHITE announced the judgment of the Court and delivered an opinion, in Parts I, III, IV, and V of which JUSTICE REHNQUIST joined.

The threshold issue before the Court is whether the private plaintiffs in this case need to prove discriminatory intent to establish a violation of Title VI of the Civil Rights Act of 1964, 78 Stat. 252, as amended, 42 U. S. C. § 2000d *et seq.*,[1] and administrative implementing regulations promulgated thereunder. I conclude, as do four other Justices, in separate opinions, that the Court of Appeals erred in requiring proof of discriminatory intent.[2] However, I conclude that the judgment below should be affirmed on other grounds, because, in the absence of proof of discriminatory animus, compensatory relief should not be awarded to private Title VI plaintiffs; unless discriminatory intent is shown, declaratory and limited injunctive relief should be the only available private remedies for Title VI violations. There being four other Justices who would affirm the judgment of the Court of Appeals, that judgment is accordingly affirmed.

---

*Thomas I. Atkins* and *Michael H. Sussman* filed a brief for the NAACP as *amicus curiae.*

[1] Section 601 of the Act, 78 Stat. 252, 42 U. S. C. § 2000d, provides: "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

[2] The five of us reach the conclusion that the Court of Appeals erred by different routes. JUSTICE STEVENS, joined by JUSTICE BRENNAN and JUSTICE BLACKMUN, reasons that, although Title VI itself requires proof of discriminatory intent, the administrative regulations incorporating a disparate-impact standard are valid. *Post,* at 642–645. JUSTICE MARSHALL would hold that, under Title VI itself, proof of disparate-impact discrimination is all that is necessary. *Post,* at 623. I agree with JUSTICE MARSHALL that discriminatory animus is not an essential element of a violation of Title VI. I also believe that the regulations are valid, even assuming, *arguendo,* that Title VI, in and of itself, does not proscribe disparate-impact discrimination. Part II, *infra.*

# I

This class action involves a challenge by black and Hispanic police officers, petitioners here,[3] to several written examinations administered by New York City between 1968 and 1970 that were used to make entry-level appointments to the city's Police Department (Department) through October 1974.[4] The District Court found that the challenged examinations had a discriminatory impact on the scores and pass-rates of blacks and Hispanics and were not job-related. These findings were not disturbed in the Court of Appeals.

Each member of the plaintiff class seeking relief from discrimination achieved a passing score on one of the challenged examinations and was hired as a police officer. Since appointments were made in order of test scores, however, the examinations caused the class members to be hired later than similarly situated whites, which lessened the petitioners' seniority and related benefits. Accordingly, when the Department laid off police officers in June 1975 on a "last-hired, first-fired" basis, those officers who had achieved the lowest scores on the examinations were laid off first, and the plaintiff black and Hispanic officers were disproportionately affected by the layoffs.

On April 30, 1976, petitioners filed the present suit[5] against the Department and other New York City officials

---

[3] The class representatives are The Guardians Association of the New York City Police Department, Inc., The Hispanic Society of the New York City Police Department, Inc., Oswaldo Perez, and Felix E. Santos.

[4] Petitioners also alleged that the Department's 5' 7'' minimum height requirement discriminated against Hispanics. The disposition of this issue in the lower courts is not now before us.

[5] This was petitioners' second judicial attack on the Department's use of the examinations. Petitioners first filed suit in 1972, but the District Court denied their motion for a preliminary injunction restraining the making of appointments from the ranked eligibility lists generated by the challenged examinations, on the basis that the eligibility lists would soon be

and entities, the respondents here. Petitioners' amended complaint alleged that the June 1975 layoffs violated their rights under Titles VI and VII of the Civil Rights Act of 1964, 42 U. S. C. § 2000d *et seq.*, and § 2000e *et seq.*, under 42 U. S. C. § 1983, and under various other state and federal laws.[6] The primary allegation of the complaint was that but for the discriminatory impact of the challenged examinations upon minorities, petitioners would have been hired earlier and therefore would have accumulated sufficient seniority to withstand the layoffs.

After a hearing, the District Court held that, although petitioners had failed to prove that the respondents had acted with discriminatory intent, the use of the examinations violated Title VII, because the tests had a disparate impact upon minorities and were not proved by respondents to be job-related.[7] The court therefore granted petitioners' motion for a preliminary injunction restraining the Department from firing or recalling any police officers until seniority lists were reordered to accord petitioners the seniority they would have had but for respondents' discriminatory practices. 431 F. Supp. 526 (SDNY 1977). In light of its holding under

fully exhausted. The Court of Appeals affirmed. *Guardians Assn.* v. *Civil Service Comm'n*, 490 F. 2d 400 (CA2 1973). Petitioners unsuccessfully sought to revive the earlier case before filing the present suit. See 633 F. 2d 232, 235 (CA2 1980).

[6] Among these was a claim under 42 U. S. C. § 1981, which the District Court twice rejected because petitioners failed to prove discriminatory intent, which the court found to be a necessary element of a § 1981 cause of action. 431 F. Supp. 526, 534 (SDNY 1977); 466 F. Supp. 1273, 1276, n. 4 (SDNY 1979). The Court of Appeals affirmed. 633 F. 2d, at 263–268. Petitioners raised this § 1981 issue in their petition for certiorari, but they abandoned it after our decision last Term in *General Building Contractors Assn., Inc.* v. *Pennsylvania*, 458 U. S. 375 (1982), resolved the issue adversely to them. See Reply Brief for Petitioners 1, n.

[7] The District Court correctly relied on *Griggs* v. *Duke Power Co.*, 401 U. S. 424 (1971), and its progeny, as the framework for its Title VII disparate-impact analysis. 431 F. Supp., at 538–539.

Title VII, the District Court deemed it unnecessary to decide the merits of petitioners' claims under Title VI. *Id.*, at 530, n. 2.

On respondents' appeal, the Second Circuit vacated the District Court's decision and remanded the case for reconsideration in light of our holding in *Teamsters* v. *United States*, 431 U. S. 324 (1977), in which we ruled that a bona fide seniority system that merely perpetuates the effects of pre-Title VII discrimination is protected by §703(h) of that statute, 42 U. S. C. §2000e–2(h). 562 F. 2d 38 (1977). On remand, the District Court found that *Teamsters* had rendered its previous holding untenable to the extent that it granted relief with respect to discrimination occurring prior to March 24, 1972, the date on which Title VII became applicable to municipalities. See Pub. L. 92–261, §2(1), 86 Stat. 103. This meant that, under Title VII, class members hired prior to the effective date were not entitled to any relief, and that the remaining members of the class were only entitled to back seniority awards that did not take into account time periods prior to that date. 466 F. Supp. 1273, 1280 (SDNY 1979).

The court then turned to Title VI, which has been applicable to municipalities since its enactment in 1964, to see if it would provide relief for the time periods prior to March 24, 1972. After considering *Cort* v. *Ash*, 422 U. S. 66 (1975), and the various opinions in *University of California Regents* v. *Bakke*, 438 U. S. 265 (1978), the District Court concluded that an implied private right of action exists under Title VI. 466 F. Supp., at 1281–1285. Then, citing *Lau* v. *Nichols*, 414 U. S. 563 (1974), and Title VI administrative interpretative regulations adopted by several federal agencies, the court reasoned that proof of discriminatory effect is enough to establish a violation of Title VI in a private action, thereby rejecting respondents' contention that only proof of discriminatory intent could suffice. 466 F. Supp., at 1285–1287. Finally, turning to the question of relief, the court held that the

same remedies available under Title VII should be available under Title VI, unless they would conflict with some purpose peculiar to Title VI. "In the instant case, back seniority, approved as a Title VII remedy in *Franks* v. *Bowman Transportation Co.*, 424 U. S. 747 . . . (1976), is just as necessary to make discriminatees 'whole' under Title VI." *Id.*, at 1287.

Accordingly, relief was granted to the entire class pursuant to Title VI. In a subsequent order, the court set forth a detailed plan for the determination of the constructive seniority to which each individual member of the class would be entitled, and the corresponding monetary and nonmonetary entitlements that would be derived therefrom. The court also ordered respondents to meet and consult with petitioners on the preparation and use of future examinations. App. A99–A107.

Respondents appealed once again to the Second Circuit, which affirmed the relief under Title VII but reversed as to Title VI. 633 F. 2d 232 (1980). All three members of the panel agreed that the award of Title VI relief could not be sustained, but the panel divided on the rationale for this conclusion. Two judges held that the trial court erred by concluding that Title VI does not require proof of discriminatory intent. They believed that this Court's decision in *Lau* v. *Nichols, supra,* which held that proof of discriminatory impact could suffice to establish a Title VI violation, had been implicitly overruled by the judgment and supporting opinions in *Bakke, supra.* 633 F. 2d, at 270 (Kelleher, J.); *id.*, at 274–275 (Coffrin, J.).

The third member of the panel, Judge Meskill, declined to reach the question whether Title VI requires proof of discriminatory intent. Instead, he concluded that the "compensatory remedies sought by and awarded to plaintiffs in the case at bar are not available to private litigants under Title VI." *Id.*, at 255. Nothing in the legislative history, Judge Meskill observed, indicated that Title VI was intended to compensate individuals excluded from the benefits of a program receiving federal assistance, and in his view a compen-

satory private remedy would work at cross-purposes with the administrative enforcement mechanism expressly provided by § 602 of Title VI, 42 U. S. C. § 2000d–1, and with the objectives of the federal assistance statutes. 633 F. 2d, at 255–262.[8]

After the Second Circuit denied petitions for rehearing from both sides, 633 F. 2d 232 (1980), we granted the plaintiffs' petition for certiorari, 454 U. S. 1140,[9] which claimed error solely on the basis that proof of discriminatory intent is not required to establish a Title VI violation.

## II

The Court squarely held in *Lau* v. *Nichols, supra,* that Title VI forbids the use of federal funds not only in programs that intentionally discriminate on racial grounds but also in those endeavors that have a disparate impact on racial minorities. The Court of Appeals recognized this but was of the view, as are respondents, that *University of California Regents* v. *Bakke, supra,* had confined the reach of Title VI to those programs that are operated in an intentionally discriminatory manner. For two reasons, I disagree with this reading of *Bakke.*

## A

First, I recognize that in *Bakke* five Justices, including myself, declared that Title VI on its own bottom reaches no

---

[8] The panel majority disagreed with Judge Meskill's views, reading our decisions in *Bakke* and *Cannon* v. *University of Chicago,* 441 U. S. 677 (1979), as allowing a private right of action under Title VI irrespective of the compensatory effect of the relief sought or granted. Also, fearing that part of the noncompensatory relief in the District Court's order might not be available to the entire class under Title VII, the court could not agree with Judge Meskill's conclusion that his rationale made it unnecessary to decide whether Title VI requires proof of discriminatory intent. 633 F. 2d, at 274.

[9] Respondents also filed a petition for certiorari, in which they seek review of the Court of Appeals' determination that the plaintiff class is entitled to relief under Title VII. *Civil Service Comm'n of the City of New York* v. *Guardians Assn.,* No. 81–432.

further than the Constitution,[10] which suggests that, in light of *Washington* v. *Davis*, 426 U. S. 229 (1976), Title VI does not of its own force proscribe unintentional racial discrimination. The Court of Appeals thought these declarations were inconsistent with *Lau*'s holding that Title VI contains its own prohibition of disparate-impact racial discrimination. The issue in *Bakke*, however, was whether Title VI forbids intentional discrimination in the form of affirmative action intended to remedy past discrimination, even though such affirmative action is permitted by the Constitution. Holding that Title VI does not bar such affirmative action if the Constitution does not is plainly not determinative of whether Title VI proscribes unintentional discrimination in addition to the intentional discrimination that the Constitution forbids.

It is sensible to construe Title VI, a statute intended to protect racial minorities, as not forbidding those intentional, but benign, racial classifications that are permitted by the Constitution, yet as proscribing burdensome, nonbenign discriminations of a kind not contrary to the Constitution. Although some of the language in the *Bakke* opinions has a broader sweep, the holdings in *Bakke* and *Lau* are entirely consistent. Absent some more telling indication in the *Bakke* opinions that *Lau* was being overruled, I would not so hold.[11]

---

[10] See *University of California Regents* v. *Bakke*, 438 U. S., at 287 (POWELL, J.); *id.*, at 328 (opinion of BRENNAN, WHITE, MARSHALL, and BLACKMUN, JJ.).

[11] JUSTICE STEVENS correctly states that "when the Court unequivocally rejects one reading of a statute, its action should be respected in future litigation. . . . If a statute is to be amended after it has been authoritatively construed by this Court, that task should almost always be performed by Congress." *Post*, at 641. However, JUSTICE STEVENS appears to ignore his own admonition by disregarding the square holding of *Lau* v. *Nichols,* the only case that directly addressed the present issue. In *Lau*, we "unequivocally reject[ed]" the notion that Title VI requires proof of discriminatory intent. Since Congress has chosen not to modify

## B

Even if I am wrong in concluding that *Bakke* did not over-rule *Lau*, as so many of my colleagues believe, there is another reason for holding that disproportionate-impact discrimination is subject to the Title VI regime.   In *Lau*, the Court was unanimous in affirming a holding that the school district there involved was forbidden by Title VI to practice unintentional as well as intentional discrimination against racial minorities.   Five Justices were of the view that Title VI itself forbade impact discrimination.   *Lau*, 414 U. S., at 566–569.   Justice Stewart, joined by THE CHIEF JUSTICE and JUSTICE BLACKMUN, concurred in the result.   The concurrence stated that it was not at all clear that Title VI, standing alone, would prohibit unintentional discrimination, but that the Title VI implementing regulations, which explicitly forbade impact discrimination, were valid because not inconsistent with the purposes of Title VI.   *Id.*, at 569–571.[12] Even if *Bakke* must be taken as overruling *Lau*'s holding that the statute itself does not reach disparate impact, none of the five Justices whose opinions arguably compel this result considered whether the statute would permit regulations that clearly reached such discrimination.   And no Justice in *Bakke* took issue with the view of the three concurring Justices in *Lau*, who concluded that even if Title VI itself did not proscribe unintentional racial discrimina-

Title VI after it was "authoritatively construed" in *Lau*, we should be especially slow to adopt a new construction of the statute at this late date.

[12] Section 602 of Title VI, 78 Stat. 252, 42 U. S. C. § 2000d–1, empowers agencies providing federal financial assistance to issue "rules, regulations, or orders of general applicability which shall be consistent with achievement of the objectives of the statute authorizing the financial assistance . . . ."   Justice Stewart explained that the regulations therefore should be upheld as valid, because they were " ' "reasonably related to the purposes of the enabling legislation." ' "   *Lau* v. *Nichols*, 414 U. S., at 571 (opinion concurring in result) (quoting *Mourning* v. *Family Publications Service, Inc.*, 411 U. S. 356, 369 (1973), in turn quoting *Thorpe* v. *Housing Authority of City of Durham*, 393 U. S. 268, 280–281 (1969)).

tion, it nevertheless permitted federal agencies to promulgate valid regulations with such effect. The upshot of Justice Stewart's opinion was that those charged with enforcing Title VI had sufficient discretion to enforce the statute by forbidding unintentional as well as intentional discrimination. Nothing that was said in *Bakke* is to the contrary.

Of course, this leaves the question whether THE CHIEF JUSTICE, Justice Stewart, and JUSTICE BLACKMUN were correct in their reading of the statute. I am convinced that they were. The language of Title VI on its face is ambiguous; the word "discrimination" is inherently so. It is surely subject to the construction given the antidiscrimination proscription of Title VII in *Griggs* v. *Duke Power Co.*, 401 U. S. 424 (1971), at least to the extent of permitting, if not requiring, regulations that reach disparate-impact discrimination. As Justice Stewart pointed out, the federal agency given enforcement authority had consistently construed Title VI in that manner. *Lau, supra,* at 570 (opinion concurring in result). Moreover, soon after the passage of Title VI, the Department of Justice, which had helped draft the legislation, assisted seven agencies in the preparation of regulations incorporating the disparate-impact standard of discrimination.[13] These regulations were early interpretations of the statute by the agencies charged with its enforcement, and we should not reject them absent clear inconsistency with the face or structure of the statute, or with the unmistakable mandate of the legislative history. *Zenith Radio Corp.* v. *United States*, 437 U. S. 443, 450 (1978). I discern nothing in the legislative history of Title VI, and nothing has been presented by respondents, that is at odds with the administrative construction of the statutory terms. The Title, furthermore, has been consistently administered in this manner

---

[13] See 29 Fed. Reg. 16274–16305 (1964). As JUSTICE MARSHALL notes, *post,* at 619, shortly after these initial regulations were promulgated, every Cabinet department and about 40 federal agencies adopted Title VI regulations prohibiting disparate-impact discrimination.

for almost two decades without interference by Congress.[14] Under these circumstances, it must be concluded that Title VI reaches unintentional, disparate-impact discrimination as well as deliberate racial discrimination.

## III

Although the Court of Appeals erred in construing Title VI, it does not necessarily follow that its judgment should be reversed. As an alternative ground for affirmance, respondents defend the judgment on the basis that there is no private right of action available under Title VI that will afford petitioners the relief that they seek.[15] I agree that the relief denied petitioners under Title VII is unavailable to them under Title VI, at least where no intentional discrimination has been proved, as is the case here.

### A

I deal first with the matter of a private cause of action under Title VI. In *Lau* v. *Nichols*, non-English-speaking Chinese students sought relief against the San Francisco School District, claiming that they should be taught the English language, that instruction should proceed in Chinese, or that some other way should be provided to afford them equal educational opportunity. This Court, reversing the Court of Appeals, gave relief under Title VI. The existence of a private cause of action under that Title, however, was not disputed in that case.

Four years later, the Court decided *University of California Regents* v. *Bakke*, which also involved a private suit

---

[14] JUSTICE MARSHALL details, *post*, at 620, how Congress has rebuffed efforts to overturn the Title VI disparate-impact regulations, and how Congress, with full awareness of how the agencies were interpreting Title VI, has modeled later statutes on § 601 of Title VI, thus indicating approval of the administrative definition. Cf. *Bob Jones University* v. *United States*, 461 U. S. 574 (1983); *Haig* v. *Agee*, 453 U. S. 280, 291–300 (1981) (agency interpretation of a statute may be confirmed or ratified by congressional inaction).

[15] See Brief for Respondents 8–9; Tr. of Oral Arg. 21–22.

seeking relief under Title VI against state educational authorities. Four Justices assumed, but did not decide, that a private action was available under Title VI.[16]   A fifth Justice was of the view that no private cause of action could be implied under the Title.[17]   The four remaining Justices concluded that a private action was available.[18]

Still later, in *Cannon* v. *University of Chicago*, 441 U. S. 677 (1979), the Court, applying the factors specified in *Cort* v. *Ash*, 422 U. S. 66 (1975), held that private parties could sue to enforce the prohibitions of Title IX of the Education Amendments of 1972, 20 U. S. C. § 1681 *et seq.*, against gender-based discrimination in any educational program supported by federal funds.   A major part of the analysis was that Title IX had been derived from Title VI, that Congress understood that private remedies were available under Title VI, and that Congress intended similar remedies to be available under Title IX.   441 U. S., at 694–703.   Furthermore, it was the unmistakable thrust of the *Cannon* Court's opinion that the congressional view was correct as to the availability of private actions to enforce Title VI.   *Id.*, at 710–716.   Two Justices, in dissent, were of the view that private remedies under Title VI itself were not available and that the same was true under Title IX.   Those Justices, however, asserted that 42 U. S. C. § 1983 was available to enforce the proscriptions of Title VI and Title IX where the alleged discriminatory practices were being carried on under the color of state law.   *Id.*, at 717–730 (WHITE, J., dissenting, joined by BLACKMUN, J.).   Thus at least eight Justices in *Cannon* were of the view that Title VI and Title IX could be

---

[16]*Bakke*, 438 U. S., at 281–284 (POWELL, J.); *id.*, at 328 (BRENNAN, MARSHALL, and BLACKMUN, JJ.).

[17]*Id.*, at 379 (WHITE, J.).   This Justice, however, was of the view that where the alleged discriminatory conduct constitutes state action, a cause of action under 42 U. S. C. § 1983 is available.

[18]*Id.*, at 419–421, 420, n. 28 (STEVENS, J., joined by BURGER, C. J., and Stewart and REHNQUIST, JJ.).

enforced in a private action against a state or local agency receiving federal funds, such as the respondent Department.[19] See also *Maine* v. *Thiboutot*, 448 U. S. 1 (1980).

## B

Petitioners, however, are not entitled to a "make whole" remedy for respondents' Title VI violations. Whether a litigant has a cause of action "is analytically distinct and prior to the question of what relief, if any, a litigant may be entitled to receive." *Davis* v. *Passman*, 442 U. S. 228, 239 (1979). The usual rule is that where legal rights have been invaded and a cause of action is available, a federal court may use any available remedy to afford full relief. *Bell* v. *Hood*, 327 U. S. 678, 684 (1946). The general rule nevertheless yields where necessary to carry out the intent of Congress or to avoid frustrating the purposes of the statute involved.

For example, in *Transamerica Mortgage Advisors, Inc.* v. *Lewis*, 444 U. S. 11 (1979), the Court found that a private right of action for only limited relief could be implied under the Investment Advisers Act of 1940, 15 U. S. C. § 80b–1 *et seq.*, which prohibits certain practices in connection with investment advisory contracts. Section 215 of the Act declared that contracts whose formation or performance would violate the Act were void, and the Court concluded that Congress intended "that the customary legal incidents of voidness would follow, including the availability of a suit for rescission or for an injunction against continued operation of the contract." 444 U. S., at 19. But the Court refused to allow recovery of monetary relief in a private suit alleging violations of the Act, stating that, in the absence of a contrary legislative intent, "where a statute expressly provides a par-

---

[19] One Justice disagreed with the Court's holding that a private right of action could be implied under Title IX itself, without expressing a view as to whether Title IX could be privately enforced via § 1983. 441 U. S., at 730–749 (POWELL, J., dissenting).

ticular remedy or remedies, a court must be chary of reading others into it." *Ibid.*

We have also indicated that "make whole" remedies are not ordinarily appropriate in private actions seeking relief for violations of statutes passed by Congress pursuant to its "power under the Spending Clause to place conditions on the grant of federal funds." *Pennhurst State School and Hospital* v. *Halderman*, 451 U. S. 1, 15 (1981). This is because the receipt of federal funds under typical Spending Clause legislation is a consensual matter: the State or other grantee weighs the benefits and burdens before accepting the funds and agreeing to comply with the conditions attached to their receipt. Typically, before funds are advanced, the appropriate federal official will determine whether the grantee's plan, proposal, or program will satisfy the conditions of the grant or other extension of federal funds, and the grantee will have in mind what its obligations will be. When in a later private suit brought by those for whose benefit the federal money was intended to be used it is determined, contrary to the State's position, that the conditions attached to the funds are not being complied with, it may be that the recipient would rather terminate its receipt of federal money than assume the unanticipated burdens.

Thus, the Court has more than once announced that in fashioning remedies for violations of Spending Clause statutes by recipients of federal funds, the courts must recognize that the recipient has "alternative choices of assuming the additional costs" of complying with what a court has announced is necessary to conform to federal law or of "not using federal funds" and withdrawing from the federal program entirely. *Rosado* v. *Wyman*, 397 U. S. 397, 420–421 (1970). Although a court may identify the violation and enjoin its continuance or order recipients of federal funds prospectively to perform their duties incident to the receipt of federal money, the recipient has the option of withdrawing and hence terminating the prospective force of the injunction.

*Pennhurst State School and Hospital* v. *Halderman, supra,* reiterated the *Rosado* approach: Remedies to enforce spending power statutes must respect the privilege of the recipient of federal funds to withdraw and terminate its receipt of federal money rather than assume the further obligations and duties that a court has declared are necessary for compliance. 451 U. S., at 29–30, 30, n. 23; *id.,* at 53–55 (WHITE, J., dissenting in part). The Court noted that "in no [Spending Clause] case . . . have we required a State to provide money to plaintiffs, much less required" a State to assume more burdensome obligations. *Id.,* at 29.

## IV

Since the private cause of action under Title VI is one implied by the judiciary rather than expressly created by Congress, we should respect the foregoing considerations applicable in Spending Clause cases and take care in defining the limits of this cause of action and the remedies available thereunder. Because it was found that there was no proof of intentional discrimination by respondents, I put aside for present purposes those situations involving a private plaintiff who is entitled to the benefits of a federal program but who has been intentionally discriminated against by the administrators of the program. In cases where intentional discrimination has been shown, there can be no question as to what the recipient's obligation under the program was and no question that the recipient was aware of that obligation. In such situations, it may be that the victim of the intentional discrimination should be entitled to a compensatory award, as well as to prospective relief in the event the State continues with the program.[20]

---

[20] It is not uncommon in the law for the extent of a defendant's liability to turn on the extent of his knowledge or culpability. Thus, it has been said that, under principles of contract law, a contracting party cannot be held liable for extraordinary harm due to special circumstances unless, at the

However that may be, the Court of Appeals in this case did not disturb the District Court's finding that there was no intentional discrimination on racial grounds. The discrimination was unintentional and resulted from the disproportionate impact of the entry-level tests on racial minorities. In this and similar situations, it is not immediately obvious what the grantee's obligations under the federal program were and it is surely not obvious that the grantee was aware that it was administering the program in violation of the statute or regulations. In such cases, proof of discriminatory impact does not end the matter. If the grantee can bear the burden of proving some "business necessity" for practices that have discriminatory impact, it has a complete affirmative defense to claims of violation. *Griggs* v. *Duke Power Co.*, 401 U. S., at 431. In the typical case where deliberate discrimination on racial grounds is not shown, the recipient will have at least colorable defenses to charges of illegal disparate-impact discrimination, and it often will be the case that, prior to judgment, the grantee will not have known or have had compelling reason to know that it had been violating the federal standards. Hence, absent clear congressional intent or guidance to the contrary, the relief in private actions should be limited to declaratory and injunctive relief ordering future compliance with the declared statutory and regulatory obligations. Additional relief in the form of money or otherwise based on past unintentional violations should be withheld.

The foregoing considerations control decision in this case. I note first that Title VI is spending-power legislation:

time the contract was made, he knew or had reason to know the circumstances that made such extraordinary injury probable "so as to have the opportunity of judging for himself as to the degree of this probability." 5 A. Corbin, Contracts § 1014 (1964). See also *id.*, §§ 1006–1019; 11 W. Jaeger, Williston on Contracts § 1344A (3d ed. 1968). And in tort law, usually only persons who have intentionally or recklessly violated another's rights are liable for punitive damages. See *Smith* v. *Wade*, 461 U. S. 30 (1983); W. Prosser, Law of Torts 9–10 (4th ed. 1971).

"It is not a regulatory measure, but an exercise of the unquestioned power of the Federal Government to 'fix the terms on which Federal funds shall be disbursed.' *Oklahoma* v. *Civil Service Commission*, 330 U. S. 127, 143 (1947). No recipient is required to accept Federal aid. If he does so voluntarily, he must take it on the conditions on which it is offered." 110 Cong. Rec. 6546 (1964) (Sen. Humphrey).

Accord, *id.*, at 1527 (memorandum by Rep. Celler) (validity of Title VI "rests on the power of Congress to fix the terms on which Federal funds will be made available"); *id.*, at 6562 (Sen. Kuchel); *id.*, at 7063 (Sen. Pastore). Title VI rests on the principle that "taxpayers' money, which is collected without discrimination, shall be spent without discrimination." *Id.*, at 7064 (Sen. Ribicoff). Accord, *id.*, at 7054–7055, 7062 (Sen. Pastore); *id.*, at 7102 (Sen. Javits); *id.*, at 6566 (memorandum by the Republican Members of the House Committee on the Judiciary). The mandate of Title VI is "[v]ery simple. Stop the discrimination, get the money; continue the discrimination, do not get the money." *Id.*, at 1542 (Rep. Lindsay). Title VI imposes no obligations but simply " 'extends an option' " that potential recipients are free to accept or reject. *Id.*, at 1527 (memorandum by Rep. Celler) (quoting *Massachusetts* v. *Mellon*, 262 U. S. 447, 480 (1923)). This legislative history clearly shows that Congress intended Title VI to be a typical "contractual" spending-power provision.

Since Title VI is Spending Clause legislation, it is presumed that private litigants seeking to enforce compliance with its terms are entitled to no more than the limited remedy deemed available to the plaintiffs in *Pennhurst*. The inquiry is not at this point complete, however, because, like all rules of statutory construction, the *Pennhurst* presumption must "yield . . . to persuasive evidence of contrary legislative intent." *Transamerica*, 444 U. S., at 20. As in *Transamerica*, however, the relevant legislative history of Title VI reveals that "what evidence of intent exists in this case, cir-

cumstantial though it may be, weighs against the implication of a private right of action for a monetary award in a case such as this," *ibid.*, at least absent proof of intentional discrimination.

Title VI does not explicitly allow for *any* form of a private right of action. This fact did not go unnoticed by Senators Keating and Ribicoff, who unsuccessfully proposed an amendment adding to Title VI a provision expressly allowing the institution of "a civil action or other proper proceeding for preventive relief, including an application for a permanent or temporary injunction, restraining order, or other order, . . . by the person aggrieved." 109 Cong. Rec. 15375 (1963). Senator Keating explained that, under this proposal, if someone violated Title VI, funds could be denied or "a suit for specific performance of the nondiscrimination requirement could be brought . . . by the victim of the discrimination." *Id.*, at 15376. The relevant language of the proposed amendment was identical to that of § 204(a) of the Civil Rights Act of 1964, 42 U. S. C. § 2000a–3(a), the provision creating a private right of action to enforce Title II of the Act, which deals with discrimination in public accommodations. Suits under § 204(a) are "private in form only. When a plaintiff brings an action under that Title, he cannot recover damages. If he obtains an injunction, he does so not for himself alone but also as a 'private attorney general,' vindicating a policy that Congress considered of the highest priority." *Newman* v. *Piggie Park Enterprises*, 390 U. S. 400, 401–402 (1968). Senator Keating thought that elementary fairness required that victims of Title VI-proscribed discrimination be accorded the same private right of action as allowed in the "proposed education and public accommodations titles of the [Civil Rights] bill."[21]

The Keating-Ribicoff proposal was not included in Title VI, but the important point for present purposes is that even the

---

[21] Hearings on S. 1731 and S. 1750 before the Senate Committee on the Judiciary, 88th Cong., 1st Sess., 335 (1963) (Sen. Keating).

most ardent advocates of private enforcement of Title VI contemplated that private plaintiffs would only be awarded "preventive relief." Like the drafters of Title II, they did not intend to allow private plaintiffs to recover monetary awards. Although the expressed intent of Senators Keating and Ribicoff is alone not determinative of whether a compensatory remedy may be obtained in a private action to enforce Title VI, "it is one more piece of evidence that Congress did not intend to authorize a cause of action for anything beyond limited equitable relief." *Transamerica Mortgage Advisors, Inc.* v. *Lewis, supra,* at 22. Surely, it did not intend to do so where intentional discrimination is not shown.

The remaining indications of congressional intent are also circumstantial, but they all militate in favor of the conclusion that only prospective relief ordering compliance with the terms of the grant is appropriate as a private remedy for Title VI violations in cases such as this. The "greatest possible emphasis" was given to the fact that the "real objective" of Title VI was "the elimination of discrimination in the use and receipt of Federal funds." 110 Cong. Rec. 6544 (1964) (Sen. Humphrey). See also *id.,* at 7062 (Sen. Pastore). The remedy of termination of assistance was regarded as "a last resort, to be used only if all else fails," because "cutoffs of Federal funds would defeat important objectives of Federal legislation, without commensurate gains in eliminating racial discrimination or segregation." *Id.,* at 6544, 6546 (Sen. Humphrey).[22]

To ensure that this intent would be respected, Congress included an explicit provision in § 602 of Title VI that requires that any administrative enforcement action be "consistent with achievement of the objectives of the statute authorizing the financial assistance in connection with which the action is taken." 42 U. S. C. § 2000d–1. Although an award of damages would not be as drastic a remedy as a cutoff of funds,

---

[22] See also, *e. g.,* 110 Cong. Rec. 1520 (1964) (Rep. Celler); *id.,* at 7063 (Sen. Pastore); *id.,* at 7065 (Sen. Ribicoff).

the possibility of large monetary liability for unintended discrimination might well dissuade potential nondiscriminating recipients from participating in federal programs, thereby hindering the objectives of the funding statutes. See 633 F. 2d, at 261–262 (opinion of Meskill, J.).

In summary, there is no legislative history that in any way rebuts the *Pennhurst* presumption that only limited injunctive relief should be granted as a remedy for unintended violations of statutes passed pursuant to the spending power. What little evidence there is evinces an intent not to allow any greater relief.[23]    I conclude that compensatory relief, or

---

[23] The lower courts are generally in agreement that it is not appropriate to award monetary damages for Title VI violations.    See *Lieberman* v. *University of Chicago*, 660 F. 2d 1185 (CA7 1981) (Title IX case), cert. denied, 456 U. S. 937 (1982); *Drayden* v. *Needville Independent School District*, 642 F. 2d 129, 133 (CA5 1981); *Nabke* v. *HUD*, 520 F. Supp. 5, 10–11 (WD Mich. 1981); *Concerned Tenants Assn.* v. *Indian Trails Apartments*, 496 F. Supp. 522, 526–527 (ND Ill. 1980); *Rendon* v. *Utah State Dept. of Employment Security Job Service*, 454 F. Supp. 534 (Utah 1978).    See also C. Antieau, Federal Civil Rights Acts § 317 (1980); 2 N. Dorsen, P. Bender, B. Neuborne, & S. Law, Political and Civil Rights in the United States 608 (4th ed. 1979).    But cf. *Miener* v. *Missouri*, 673 F. 2d 969, 977–979 (CA8 1982) (holding that damages may be recovered under § 504 of the Rehabilitation Act of 1973, which was considered to be "closely analogous" to Title VI); *Gilliam* v. *City of Omaha*, 388 F. Supp. 842 (Neb.) (dicta), aff'd without mention of remedies, 524 F. 2d 1013 (CA8 1975); *Quiroz* v. *City of Santa Ana*, 18 FEP Cases 1138 (CD Cal. 1978) (dicta); *Flanagan* v. *President & Directors of Georgetown College*, 417 F. Supp. 377 (DC 1976) (dicta).

JUSTICE STEVENS argues, *post*, at 638, that even if Title VI authorizes only a limited remedy, full relief is available in this case because the petitioners "sought relief under 42 U. S. C. § 1983," and § 1983 "provides a damages remedy."    Damages indeed are usually available in a § 1983 action, but such is not the case when the plaintiff alleges only a deprivation of rights secured by a Spending Clause statute.    Thus, in *Pennhurst State School and Hospital* v. *Halderman*, 451 U. S. 1, 27–29 (1981), the Court indicated that, even if the plaintiffs were entitled to relief under § 1983 for defendants' alleged violations of certain Spending Clause legislation, the defendants would not be required "to provide money to [the] plaintiffs."

other relief based on past violations of the conditions attached to the use of federal funds, is not available as a private remedy for Title VI violations not involving intentional discrimination.[24]

## V

If the relief unavailable under Title VII and ordered under Title VI is the kind of relief that should be withheld in enforcing a Spending Clause statute, the Court should affirm the judgment of the Court of Appeals without more. Only if all or some of this relief is the kind of declaratory or prospective relief that private enforcement of Title VI properly contemplates should the Court of Appeals be reversed in whole or in part. To resolve this matter, I now consider the items of re-

---

[24] JUSTICE MARSHALL erroneously contends, *post*, at 632, that my view "would allow recipients to violate the conditions of their contracts until a court identifies the violation and either enjoins its continuance or orders the recipient to begin performing its duties incident to the receipt of federal money." This is not so, because the Federal Government can always sue any recipient who fails to comply with the terms of the grant agreement and force the violator to repay misspent funds. See *Bell* v. *New Jersey*, 461 U. S. 773, 794 (1983) (WHITE, J., concurring). But it is an entirely different matter to subject the recipient to open-ended liability to private plaintiffs. JUSTICE MARSHALL's third-party beneficiary analogy, *post*, at 632–633, is appealing, but he ignores the possibility that Congress may have felt that the salutary deterrent effect of a compensatory remedy was outweighed by the possibility that such a remedy would dissuade potential recipients from participating in important federal programs. Of course, not every contract that benefits third persons accords enforceable rights in such persons; it is a question of intent. See 4 A. Corbin, Contracts § 777 (1951). Section 313 of the Restatement (Second) of Contracts (1981) states that a party who contracts with a government agency to do an act or render a service to the public is generally *not* subject to contractual liability to a member of the public for consequential damages resulting from performance or failure to perform. The only exceptions to this rule involve situations where the terms of the contract provide for such liability, or where the governmental entity would be subject to liability to the injured member of the public. *Ibid.* Neither of these exceptions is applicable in the present context.

lief ordered by the District Court to determine if any element is a permissible injunctive remedy.

Although the Eleventh Amendment cases are not dispositive here, in holding that only prospective relief is available to remedy violations of federal law by state officials, the Court in *Edelman* v. *Jordan*, 415 U. S. 651, 667 (1974), observed that the difference between permissible and impermissible relief "will not in many instances be that between day and night." It seems as patent here as in the Eleventh Amendment context that the relief cannot include a monetary award for past wrongs, even if the award is in the form of "equitable restitution" instead of damages. See *id.*, at 665–667. However, prospective relief need not be "totally without effect on the [defendant's] revenues"; injunctive relief is permissible even if it means that the defendants, in order to shape their conduct to the mandate of the court's decree, will have to spend more money "than if they had been left free to pursue their previous course of conduct." *Id.*, at 667–668. The key question for present purposes is whether the decree requires the payment of funds or grants other relief, "not as a necessary consequence of compliance in the future with a substantive federal-question determination, but as a form of compensation" or other relief based on or flowing from violations at a prior time when the defendant "was under no court-imposed obligation to conform to a different standard." *Id.*, at 668.

The District Court in the present case granted a number of relatively discrete items of relief. First, each class member was awarded constructive seniority, which included the right to: (1) "all monetary entitlements which [the class members] would have received had they been appointed on their constructive seniority date," including backpay and back medical and insurance benefits; and (2) all other entitlements relative to the award of constructive seniority, including salary, benefits, and pension rights. Also, respondents were directed to give a sergeant's examination to those class members whose

constructive seniority would have entitled them to take the last such examination.  Finally, in an effort to insure that future hiring practices would be nondiscriminatory, respondents were ordered to consult with petitioners on the preparation and use of future police officer examinations for the next two years, and to provide petitioners with race and ethnicity information regarding the scores of the next scheduled examination.  App. A99–A107.[25]

On the one hand, it is obvious that the award of backpay and back benefits constitutes relief based upon past conduct no longer permissible; it therefore should not stand.  On the other hand, it is without doubt that the portion of the order requiring consultation to insure that future examinations will not have discriminatory effects constitutes permissible injunctive relief aimed at conforming respondents' future conduct to the declared law.

This leaves the award of constructive seniority for purposes of future entitlements: the right to take the special sergeant's examination ordered by the District Court and the right to an increase of salary and benefits to the level warranted by the constructive seniority.  Because such an award affects only the future conduct of a defendant, it arguably could be categorized as permissible prospective relief.  I conclude, however, that an award of constructive seniority, for any purpose whatsoever, must be deemed impermissible retroactive relief.

In *Franks* v. *Bowman Transportation Co.*, 424 U. S. 747, 766–767 (1976), we identified two types of seniority—"benefit" and "competitive status."  The first of these, "which determines pension rights, length of vacations, size of insurance coverage and unemployment benefits, and the like, is analogous to backpay. . . . Benefit-type seniority, like backpay, serves to work complete equity by penalizing the wrongdoer economically at the same time that it tends to make whole the

---

[25] As permitted by 42 U. S. C. § 2000e–5(k) and 42 U. S. C. § 1988, the District Court also awarded attorney's fees to petitioners.  App. A107.

one who was wronged." *Id.*, at 786–787 (POWELL, J.). A general bar to the award of retroactive seniority "reduces the restitution required of an employer at such time as he is called upon to account for his discriminatory actions perpetrated in violation of the law." *Id.*, at 767, n. 27 (opinion of the Court). Since constructive benefit-type seniority in this case is obviously restitutionary and remedial in nature, it is "a form of compensation" to those whose rights were violated at a time when the respondents were "under no court-imposed obligation to conform to a different standard." *Edelman* v. *Jordan*, 415 U. S., at 668. It is therefore not an appropriate remedy for the Title VI violations alleged here.

An award of "competitive status" seniority, although prospective in form, nevertheless constitutes a form of compensation or relief based on past conduct now deemed violative of the Act. In no respect can such an award be said to be "a necessary consequence," *ibid.*, of future Title VI compliance by the employer. It therefore must also be considered an inappropriate Title VI remedy. I also note that competitive-type seniority "determines an employee's preferential rights to various economic advantages at the expense of other employees. These normally include the order of layoff and recall of employees, job and trip assignments, and consideration for promotion." *Franks, supra,* at 787 (POWELL, J.). Although an award of constructive seniority of this nature does not result in any increased costs to the wrongdoing employer, it "directly implicate[s] the rights and expectations of perfectly innocent employees," 424 U. S., at 788, and it can only be viewed as compensation for a past wrong. Accordingly, I conclude that neither "benefit" nor "competitive status" constructive seniority may be obtained as a private remedy for Title VI violations, at least in the absence of proof of intentional discrimination.

In view of the foregoing, it is apparent to me that the only proper Title VI relief granted by the District Court is the order directing the respondents to take actions and make disclosures intended to insure that future hiring practices will

be nondiscriminatory and valid. However, this relief is wholly sustainable under the District Court's findings and conclusions with respect to petitioners' Title VII claim, and all members of the class will fully benefit from it.[26] There is thus no need to disturb the judgment of the Court of Appeals.

## VI

In conclusion, for the reasons expressed above, I am convinced that discriminatory intent is not an essential element of a Title VI violation, but that a private plaintiff should recover only injunctive, noncompensatory relief for a defendant's unintentional violations of Title VI. Such relief should not include an award of constructive seniority. Albeit on different grounds, the judgment below is

*Affirmed.*[27]

JUSTICE POWELL, with whom THE CHIEF JUSTICE joins, and with whom JUSTICE REHNQUIST joins as to Part II, concurring in the judgment.

With reluctance, I write separately. The many opinions filed in this case draw lines that are not required by, and

---

[26] Under Title VII, this type of relief can be granted unconditionally. Under Title VI, the defendants should be given the option of complying or terminating participation in the federal program. See Parts IV and V, *supra.*

[27] Despite the numerous opinions, the views of at least five Justices on two issues are identifiable. The dissenters, JUSTICES BRENNAN, MARSHALL, BLACKMUN, and STEVENS, join with me to form a majority for upholding the validity of the regulations incorporating a disparate-impact standard. See n. 2, *supra.* A different majority, however, would not allow compensatory relief in the absence of proof of discriminatory intent. JUSTICE REHNQUIST and I reach this conclusion directly. See Parts III and IV, *supra; post,* at 612 (REHNQUIST, J., concurring in judgment). JUSTICE POWELL, joined by THE CHIEF JUSTICE, *post,* at 608–610, believes that no private relief should ever be granted under Title VI under any circumstances. JUSTICE O'CONNOR, *post,* at 615, would hold that all relief should be denied unless discriminatory intent is proved. It follows from the views of these three latter Justices that no compensatory relief should be awarded if discriminatory animus is not shown.

indeed in some instances seem incompatible with, our prior decisions. Our opinions today will further confuse rather than guide.[1]

## I

In *Cannon* v. *University of Chicago*, 441 U. S. 677, 730 (1979) (POWELL, J., dissenting), I would have held that Congress intended no implied private right of action under Title IX of the Education Amendments of 1972. For the same general reasons, I also would hold that petitioners may not maintain this action under Title VI of the Civil Rights Act of 1964.

Congress, for reasons of its own, all too frequently elects to remain silent on the private right-of-action question. The

---

[1] In particular, the Court is divided as to the standard of proof required to prove violations of rights in cases involving Title VI. Seven Members of the Court agree that a violation of the statute itself requires proof of discriminatory intent. See *infra,* at 610–611; *post,* at 612 (REHNQUIST, J., concurring in judgment); *post,* at 612, and n. 1 (O'CONNOR, J., concurring in judgment); *post,* at 641–642 (STEVENS, J., dissenting, joined by BRENNAN and BLACKMUN, JJ.) ("Today, proof of invidious purpose is a necessary component of a valid Title VI claim"). Only JUSTICES WHITE and MARSHALL believe that a violation of Title VI may be established by proof of discriminatory effect, and JUSTICE WHITE would recognize only noncompensatory, prospective relief for such a violation. See *ante,* at 602–604. JUSTICES BRENNAN, BLACKMUN, and STEVENS, however, believe that a violation of the *regulations* adopted pursuant to Title VI may be established by proof of discriminatory impact. See *post,* at 645 (STEVENS, J., dissenting).

Thus, a majority of the Court would hold that proof of discriminatory effect suffices to establish liability only when the suit is brought to enforce the regulations rather than the statute itself. And it would seem that the regulations may be enforced only in a suit pursuant to 42 U. S. C. § 1983; anyone invoking the implied right of action under Title VI would be limited by the discriminatory-intent standard required to prove violations of Title VI. Thus, the apparent result is that a suit against *governmental* recipients of federal funds—who may be sued under § 1983—will be governed by a different standard of liability than a suit against *private* recipients of federal funds. One would have difficulty explaining this result in terms of the legislative history of Title VI.

result frequently is uncertainty and litigation as to available remedies, leaving the courts to provide an answer without clear legislative guidance. We have recognized repeatedly that whether a private right of action may be implied requires a determination of congressional intent. See, *e. g.*, *Jackson Transit Authority* v. *Transit Union*, 457 U. S. 15, 20–23 (1982); *Touche Ross & Co.* v. *Redington*, 442 U. S. 560, 568 (1979). We look, of course, to the legislative history, and in particular to what other remedies have been provided. See *Transamerica Mortgage Advisors, Inc.* v. *Lewis*, 444 U. S. 11, 19 (1979) ("it is an elemental canon of statutory construction that where a statute expressly provides a particular remedy or remedies, a court must be chary of reading others into it").

The legislative history of Title VI is replete with references to the Act's central purpose of ensuring that taxpayers' money be spent nondiscriminatorily. See *ante*, at 599 (opinion of WHITE, J.). In accord with this purpose, Congress expressly provided for perhaps the most effective of all remedies in a federal funding statute: the cutting off of funds.[2] In addition, it created a carefully constructed ad-

---

[2] JUSTICE MARSHALL argues that private relief must be available because the statutory remedy of a fund cutoff is "impractical" and "too Draconian to be widely used." *Post*, at 626–627 (dissenting opinion). See *post*, at 638, n. 7 (STEVENS, J., dissenting). In my view, such reasoning evinces a departure from the principle that legislative intent is the guide to implying a right of action. The judiciary is not free to decide that remedies affirmatively and expressly adopted by Congress are so "impractical" or "Draconian" that judicially created remedies are necessary. See *Touche Ross & Co.* v. *Redington*, 442 U. S. 560, 578 (1979) ("The ultimate question is one of congressional intent, not one of whether this Court thinks that it can improve upon the statutory scheme that Congress enacted into law"). Rather, Congress' express adoption of one remedy—and one only—should be viewed as a congressional choice that should be obeyed. See *Cannon* v. *University of Chicago*, 441 U. S. 677, 749 (1979) (POWELL, J., dissenting) ("Where a statutory scheme expressly provides for an alternative mechanism for enforcing the rights and duties created, I would be especially reluctant ever to permit a federal court to volunteer its services for enforcement purposes").

ministrative procedure to ensure that such withholding of funds is ordered only where appropriate. In light of these factors, I do not believe that Congress intended to authorize private suits but failed to do so through some inadvertence. See also *University of California Regents* v. *Bakke*, 438 U. S. 265, 381 (1978) (opinion of WHITE, J.) ("[T]here is no express provision for private actions to enforce Title VI, and it would be quite incredible if Congress, after so carefully attending to the matter of private actions in other Titles of the Act, intended silently to create a private cause of action to enforce Title VI").[3] I would affirm the judgment below solely on this issue.

## II

There is, however, an alternative ground for affirmance. Both the District Court and the Court of Appeals agreed that petitioners had failed to show any intentional discrimination. The Court of Appeals, relying on the opinions in *Bakke*, held that such a showing—one that must be made to establish an equal protection claim—is a prerequisite to a successful Title VI claim. I agree with JUSTICE STEVENS, *post*, at 639–642, that the Court of Appeals was correct in its reading of our opinions in *Bakke*.

My conclusion in *Bakke* was that "[i]n view of the clear legislative intent, Title VI must be held to proscribe only those racial classifications that would violate the Equal Protection Clause or the Fifth Amendment." 438 U. S., at 287. JUS-

---

[3] I also would hold that private actions asserting violations of Title VI may not be brought under 42 U. S. C. § 1983. Congress' creation of an express administrative procedure for remedying violations strongly suggests that it did not intend that Title VI rights be enforced privately either under the statute itself or under § 1983. See *Middlesex County Sewerage Authority* v. *National Sea Clammers Assn.*, 453 U. S. 1, 20–21 (1981); cf. *Maine* v. *Thiboutot*, 448 U. S. 1, 22, n. 11 (1980) (POWELL, J., dissenting) (an exception to § 1983 liability is "where the governing statute provides an exclusive remedy for violations of its terms").

TICES BRENNAN, WHITE, MARSHALL, and BLACKMUN undertook a thorough analysis of the legislative history in reaching the same conclusion. See *id.*, at 328–340. They concluded "that Title VI's definition of racial discrimination is absolutely coextensive with the Constitution's." *Id.*, at 352. This construction necessarily requires rejection of the prior decision in *Lau* v. *Nichols*, 414 U. S. 563 (1974), that discriminatory impact suffices to establish liability under Title VI.[4] In my view, the Court of Appeals therefore was fully justified in holding that petitioners failed to establish their Title VI claims.[5]

For these reasons, I concur in the Court's judgment.

---

[4] The *Lau* Court did not undertake any analysis of the legislative history of Title VI, reaching its conclusion essentially without supporting reasoning. I have no occasion here to consider whether the result in *Lau* may stand despite rejection of its assumed premise.

[5] For the reasons stated by JUSTICE O'CONNOR, *post*, at 612–615, I reject JUSTICE STEVENS' novel argument that an administrative agency is free to adopt any regulation that may be said to further the purposes of an enabling statute. Administrative agencies do not have—and should not have—such lawmaking power.

JUSTICES WHITE and MARSHALL would avoid the explicit reasoning of *Bakke* by deferring to a prior administrative construction of Title VI. See *ante*, at 592–593 (opinion of WHITE, J.); *post*, at 617–623 (MARSHALL, J., dissenting). I do not question the view that the Court should "sustai[n] a reasonable administrative interpretation even if we would have reached a different result had the question initially arisen in a judicial proceeding." *Post*, at 621 (MARSHALL, J., dissenting). But I know of no precedent whatever for asserting that this deference to administrative interpretation is proper *after* this Court already has issued a definitive—and contrary—construction of its own. Moreover, in *Bakke* JUSTICES WHITE and MARSHALL agreed that "[n]owhere is there any suggestion that Title VI was intended to terminate federal funding for any reason other than consideration of race or national origin by the recipient institution in a manner inconsistent with the standards incorporated in the Constitution." 438 U. S., at 332 (opinion of BRENNAN, WHITE, MARSHALL, and BLACKMUN, JJ.). If "nowhere" is there any evidence that Congress intended the Title VI standard to differ from the constitutional standard, clearly an agency interpretation to the contrary is entitled to no deference.

JUSTICE REHNQUIST, concurring in the judgment.

I join in Parts I, III, IV, and V of JUSTICE WHITE's opinion and join in Part II of JUSTICE POWELL's opinion. I therefore would affirm the judgment of the Court of Appeals.

JUSTICE O'CONNOR, concurring in the judgment.

For reasons given in Part I of the dissent by JUSTICE STEVENS, *post*, at 636–639, I cannot agree with the limitations that JUSTICE WHITE's opinion would place on the scope of equitable relief available to private litigants suing under Title VI.[1]  Therefore, like the dissent, I would address two further questions: (1) whether proof of purposeful discrimination is a necessary element of a valid Title VI claim, and (2) if so, whether administrative regulations incorporating an impact standard may be upheld as within the agency's statutory authority.  My affirmative answer to the first question leads me to conclude that regulations imposing an impact standard are not valid.  On that basis, I would affirm the judgment below.

Were we construing Title VI without the benefit of any prior interpretation from this Court, one might well conclude that the statute was designed to redress more than purposeful discrimination.  Cf. *University of California Regents* v. *Bakke*, 438 U. S. 265, 412–418 (1978) (opinion of STEVENS, J.).  In *Bakke*, however, a majority of the Court concluded otherwise.  *Id.*, at 287 (opinion of POWELL, J.); *id.*, at 328 (opinion of BRENNAN, WHITE, MARSHALL, and BLACKMUN, JJ.).  Like JUSTICE STEVENS, *post*, at 641–642, I feel constrained by *stare decisis* to follow that interpretation of the statute.  I part company with JUSTICE STEVENS' dissent, however, when it concludes that administrative regulations incorporating an "effects" standard may be upheld notwithstanding the

---

[1] Because I conclude that the decision below should be affirmed on the ground that petitioners have failed to prove intentional discrimination, I have no occasion to address the question whether there is a private cause of action under Title VI for damages relief.

statute's proscription of intentional discrimination only. See *post*, at 642–645. Administrative regulations having the force of law may be set aside only if they exceed the statutory authority of the agency or are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. *Batterton* v. *Francis*, 432 U. S. 416, 426 (1977). JUSTICE STEVENS' dissent argues that agency regulations incorporating an "effects" standard reflect a reasonable method of "further[ing] the purposes of Title VI." *Post*, at 644. If, as five Members of the Court concluded in *Bakke*, the purpose of Title VI is to proscribe *only* purposeful discrimination in a program receiving federal financial assistance, it is difficult to fathom how the Court could uphold administrative regulations that would proscribe conduct by the recipient having only a discriminatory *effect*. Such regulations do not simply "further" the purpose of Title VI; they go well *beyond* that purpose.

The Court's decision in *City of Rome* v. *United States*, 446 U. S. 156 (1980), does not persuade me to the contrary. The challenge there was to the constitutionality of a federal statute that imposed a stricter standard of nondiscrimination than that required by the constitutional provision pursuant to which the statute was enacted. Specifically, the Court held that, under the enabling authority in §2 of the Fifteenth Amendment, Congress may enact a statute banning voting practices having a discriminatory effect, even if §1 of the Amendment prohibits only intentional discrimination in voting. *Id.*, at 178. The Court reasoned that Congress' power under §2 of the Amendment is "no less broad than its authority under the Necessary and Proper Clause." *Id.*, at 175. Therefore, as long as the statute was an appropriate means of enforcing the Fifteenth Amendment's prohibition, the statute was valid.

The breadth of authority granted to Congress under the enabling provision of the Fifteenth Amendment is not equivalent to the amount of discretion that an administrative agency possesses in implementing the provisions of a federal

statute.[2]   An administrative agency is itself a creature of statute.   Although the Court has stated that an agency's legislative regulations will be upheld if they are "reasonably related" to the purposes of the enabling statute, *Mourning* v. *Family Publications Service, Inc.*, 411 U. S. 356, 369 (1973),

---

[2] JUSTICE STEVENS relies upon a 1900 decision by this Court for the proposition that "an administrative regulation's conformity to statutory authority [is] to be measured by the same standard as a statute's conformity to constitutional authority." *Post*, at 644 (citing *Boske* v. *Comingore*, 177 U. S. 459, 470).   *Boske*, however, is distinguishable in that the statutory authority for the regulation at issue there conferred the general administrative power to adopt rules to carry out the functions of the office.   177 U. S., at 467.   With respect to this same statute, the Court observed in a subsequent case that it conferred "administrative power only. . . . [C]ertainly under the guise of regulation legislation cannot be exercised." *United States* v. *George*, 228 U. S. 14, 20 (1913).   In *George* the Court disapproved a regulation by the Interior Department which had the effect of enlarging the statute, emphasizing the fundamental "distinction between the legislative and administrative function." *Id.*, at 22.

Moreover, cases since *Boske* articulating the limitations applicable to agency rulemaking power indicate that the scope of agency discretion is indeed narrower than the language of *Boske* would suggest.   For example, in *Ernst & Ernst* v. *Hochfelder*, 425 U. S. 185 (1976), the Court declined to endorse an interpretation of Securities and Exchange Commission Rule 10b–5, 17 CFR § 240.10b–5 (1975), as proscribing mere negligent conduct. The Court observed:

"More importantly, Rule 10b–5 was adopted pursuant to authority granted the Commission under § 10(b).   The rulemaking power granted to an administrative agency charged with the administration of a federal statute is not the power to make law.   Rather, it is ' "the power to adopt regulations to carry into effect the will of Congress as expressed by the statute." ' *Dixon* v. *United States*, 381 U. S. 68, 74 (1965), quoting *Manhattan General Equipment Co.* v. *Commissioner*, 297 U. S. 129, 134 (1936).   Thus, . . . [the Rule] cannot exceed the power granted the Commission by Congress under § 10(b)."   425 U. S., at 212–214.

See also *Manhattan General Equipment Co.* v. *Commissioner*, 297 U. S., 129, 134 (1936) ("A regulation which does not [carry into effect the will of Congress as expressed by the statute], but operates to create a rule out of harmony with the statute, is a mere nullity").   Cf. *FCC* v. *American Broadcasting Co.*, 347 U. S. 284, 296 (1954) (agency cannot make illegal by regulation what is legal under the statute).

we would expand considerably the discretion and power of agencies were we to interpret "reasonably related" to permit agencies to proscribe conduct that Congress did not intend to prohibit. "Reasonably related to" simply cannot mean "inconsistent with." Yet that would be the effect of upholding the administrative regulations at issue in this case if, as five Justices concluded in *Bakke*, the expressed will of Congress is that federal funds recipients are prohibited only from purposefully discriminating on the grounds of race, color, or national origin in the administration of funded programs.

I acknowledge that in *Lau* v. *Nichols*, 414 U. S. 563 (1974), the Court approved liability under Title VI for conduct having only a discriminatory impact. Nevertheless, I believe that JUSTICES BRENNAN, WHITE, MARSHALL, and BLACKMUN accurately observed in *Bakke*, 438 U. S., at 352, that *Bakke*'s interpretation of "Title VI's definition of racial discrimination [to be] absolutely coextensive with the Constitution's" casts serious doubt on the correctness of the *Lau* decision. In my view, the logical implications of that interpretation require that *Lau* be overruled. Accordingly, I would conclude that the Title VI regulations at issue here cannot validly serve as the basis for liability. Because petitioners have failed to prove intentional discrimination, I would affirm the judgment of the Court of Appeals.

JUSTICE MARSHALL, dissenting.

We granted certiorari in this case to consider whether proof of discriminatory intent is required to establish a violation of Title VI of the Civil Rights Act of 1964, 42 U. S. C. § 2000d *et seq.* For the reasons outlined below, I agree with JUSTICE WHITE that proof of discriminatory animus should not be required. Unlike JUSTICE WHITE, however, I believe that compensatory relief may be awarded to private Title VI plaintiffs in the absence of proof of discriminatory animus. I would therefore reverse the judgment of the Court of Appeals.

I

The question presented by the petition for certiorari is whether a Title VI plaintiff can obtain relief upon proof that a non-job-related employment requirement has a discriminatory effect on minority applicants, or must also prove discriminatory intent. Pet. for Cert. i. This issue has divided the Courts of Appeals.[1] To resolve it we must decide whether our decision in *Lau* v. *Nichols,* 414 U. S. 563 (1974), which held that proof of discriminatory impact is sufficient to establish a violation of Title VI, must be overruled in light of the views subsequently expressed by five Justices in *University of California Regents* v. *Bakke,* 438 U. S. 265 (1978).

In *Lau* v. *Nichols,* this Court held that the San Francisco school system had violated Title VI by failing to provide supplemental language instruction to children of Chinese ancestry who did not speak English. The plaintiffs in *Lau* did not show that the officials in charge of the school system had intended to discriminate against students of Chinese ancestry. See *Fullilove* v. *Klutznick,* 448 U. S. 448, 479 (1980) (opinion of BURGER, C. J., joined by WHITE and POWELL, JJ.). Because the failure to provide supplemental instruction had a discriminatory impact, this Court nevertheless concluded that the school system had violated Title VI. Looking to departmental regulations for guidance, the Court emphasized that Title VI bars programs that have a discriminatory "*effect* even though no purposeful design is present." 414 U. S., at 568 (emphasis in original).

---

[1] Compare *Castaneda* v. *Pickard,* 648 F. 2d 989, 1000 (CA5 1981) (intent standard); *Cannon* v. *University of Chicago,* 648 F. 2d 1104, 1108 (CA7 1981) (same); *Lora* v. *Board of Education,* 623 F. 2d 248, 250 (CA2 1980) (same), with *NAACP* v. *Medical Center, Inc.,* 657 F. 2d 1322, 1328 (CA3 1981) (en banc) (impact standard); *Board of Education of City School Dist.* v. *Califano,* 584 F. 2d 576, 589 (CA2 1978) (same), aff'd on other grounds *sub nom. Board of Education, New York City* v. *Harris,* 444 U. S. 130 (1979); *Guadalupe Organization, Inc.* v. *Tempe Elementary School Dist. No. 3,* 587 F. 2d 1022, 1029, and n. 6 (CA9 1978) (same).

In *University of California Regents* v. *Bakke, supra,* five Justices concluded that Title VI does not prohibit a recipient of federal aid from taking race into account in an affirmative-action program designed to eradicate the vestiges of past discrimination. Since the special admissions program challenged in *Bakke* deliberately used racial criteria, that case did not require consideration of whether proof of discriminatory intent is necessary to establish a violation of Title VI. The only question posed was whether a conceded resort to race was permissible as a means of eliminating the effects of past discrimination. However, in reaching the conclusion that the consideration of race in an affirmative-action program does not violate Title VI, we relied in part on our view that Title VI's proscription of racial discrimination is coextensive with that of the Equal Protection Clause. 438 U. S., at 287 (opinion of POWELL, J.); *id.,* at 328 (opinion of BRENNAN, WHITE, MARSHALL, and BLACKMUN, JJ.). Because the Equal Protection Clause has been held to prohibit only intentional discrimination, *Washington* v. *Davis,* 426 U. S. 229, 238–248 (1976), the view we expressed in *Bakke* calls into question the holding in *Lau* v. *Nichols* that proof of discriminatory impact is sufficient to establish a violation of Title VI.[2]

If we were required to decide the issue presented by this case in the absence of a persuasive administrative interpretation of the statute, I would hold, in accordance with the view expressed in *Bakke,* that Title VI requires proof of discriminatory intent, even though this holding would entail overruling *Lau* v. *Nichols.* But the case comes to us against the background of administrative regulations that have uniformly and consistently interpreted the statute to prohibit

---

[2] We have not resolved the inconsistency between the two decisions in any of our subsequent cases. See, *e. g., Board of Education, New York City* v. *Harris, supra,* at 149 ("There thus is no need here for the Court to be concerned with the issue whether Title VI of the Civil Rights Act of 1964 incorporates the constitutional standard").

programs that have a discriminatory impact and that cannot be justified on nondiscriminatory grounds. As Justice Frankfurter once observed, the doctrine of *stare decisis* is not "an imprisonment of reason." *United States* v. *International Boxing Club of New York, Inc.*, 348 U. S. 236, 249 (1955) (dissenting opinion). The broad view expressed in *Bakke*, which was not necessary to the decision in that case, does not foreclose consideration of whether this longstanding administrative interpretation of the statute is a reasonable one which should be followed by this Court.

Shortly after the enactment of Title VI, a Presidential task force produced model Title VI enforcement regulations specifying that recipients of federal funds not use "criteria or methods of administration which have the *effect* of subjecting individuals to discrimination." 45 CFR § 80.3(b)(2) (1964) (emphasis added).[3] The Justice Department, which had helped draft the language of Title VI,[4] participated heavily in preparing the regulations.[5] Seven federal agencies and departments carrying out the mandate of Title VI soon promulgated regulations that applied a disparate-impact or "effects" test. See 29 Fed. Reg. 16274–16305 (1964). As a contemporaneous construction of a statute by those charged with setting the law in motion, these regulations deserve substantial respect in determining the meaning of Title VI. *Zenith Radio Corp.* v. *United States*, 437 U. S. 443, 450 (1978); *Power Reactor Development Co.* v. *Electricians*, 367 U. S. 396, 408 (1961); *Norwegian Nitrogen Products Co.* v. *United States*, 288 U. S. 294, 315 (1933). See also *Zuber* v. *Allen*, 396 U. S. 168, 192 (1969) (interpretation of a statute by administrators who participated in drafting it carries "most weight"). When an administrative agency has exercised its judgment

---

[3] See Comment, 36 Geo. Wash. L. Rev. 824, 845–846 (1968).

[4] Civil Rights: Hearings before Subcommittee No. 5 of the House Committee on the Judiciary, 88th Cong., 1st Sess., 2703 (1963) (testimony of Attorney General Kennedy).

[5] See Comment, 36 Geo. Wash. L. Rev., at 845–846.

with respect to an issue that is not clearly resolved by the language and purposes of the statute it is statutorily mandated to enforce, this Court will accord due consideration to the views of the agency. Indeed, in *Bakke* itself, the opinion of four Justices which I coauthored stressed that agency regulations authorizing and in some cases requiring affirmative-action programs[6] were "entitled to considerable deference in construing Title VI." 438 U. S., at 342 (BRENNAN, WHITE, MARSHALL, and BLACKMUN, JJ.).

Following the initial promulgation of regulations adopting an impact standard, every Cabinet Department and about 40 federal agencies adopted standards interpreting Title VI to bar programs with a discriminatory impact.[7] The statute has been uniformly and consistently so construed by the agencies responsible for its enforcement for nearly two decades. Our cases make clear that a longstanding and consistent administrative interpretation of a statute is entitled to special weight. *NLRB* v. *Bell Aerospace Co.*, 416 U. S. 267, 274–275 (1974); *Trafficante* v. *Metropolitan Life Insurance*

---

[6] See, *e. g.*, 34 CFR § 100.3(b)(6) (1982) (Dept. of Education); 24 CFR § 1.4(b)(6) (1982) (Dept. of Housing and Urban Development); 45 CFR § 80.3(b)(6) (1982) (Dept. of Health and Human Services); 28 CFR § 42.104(b)(6) (1982) (Dept. of Justice); 29 CFR § 31.3(b)(6) (1982) (Dept. of Labor). However, these regulations were not prepared contemporaneously with enactment of Title VI and, for that reason alone, are less weighty than the "impact" regulations.

[7] Regulations of the Cabinet Departments are as follows. Dept. of Agriculture, 7 CFR § 15.3(b)(2) (1982); Dept. of Commerce, 15 CFR § 8.4(b)(2) (1982); Dept. of Defense, 32 CFR § 300.4(b)(2) (1982); Dept. of Education, 34 CFR § 100.3(b)(2) (1982); Dept. of Energy, 10 CFR §§ 1040.13(c), (d) (1982); Dept. of Health and Human Services, 45 CFR §§ 80.3(b)(2), (3) (1982); Dept. of Housing and Urban Development, 24 CFR §§ 1.4(2)(i), (3) (1982); Dept. of the Interior, 43 CFR §§ 17.3(b)(2), (3) (1982); Dept. of Justice, 28 CFR §§ 42.104(b)(2), (3) (1982); Dept. of Labor, 29 CFR §§ 31.3(b)(2), (3) (1982); Dept. of State, 22 CFR § 141.3(b)(2) (1982); Dept. of Transportation, 49 CFR §§ 21.5(b)(2), (3) (1982); Dept. of Treasury, 31 CFR § 51.52(b)(4) (1982). For a listing of the federal agencies with such standards, see CFR Index (1982).

*Co.,* 409 U. S. 205, 210 (1972); *United States* v. *Bergh,* 352 U. S. 40, 46–47 (1956).

It is also significant that this administrative interpretation of Title VI has never been altered by Congress, despite its awareness of the interpretation. In 1966, the House of Representatives defeated a proposal to alter Title VI to prohibit only intentional discrimination, and the proposal never emerged from committee in the Senate.[8] In the Elementary and Secondary Education Amendments of 1969, Congress directed that guidelines and criteria established under Title VI dealing with *de jure* and *de facto* school segregation be applied uniformly across the country regardless of the origin or cause of such segregation. Pub. L. 91–230, § 2, 84 Stat. 121, 42 U. S. C. § 2000d–6. Since the passage of the 1964 Act, Congress has also enacted 10 additional statutes modeled on § 601 of Title VI, none of which define discrimination to require proof of intent.[9] Although caution must be exercised

---

[8] See 112 Cong. Rec. 18715 (1966) (House vote). The identical amendment was introduced by Senator Ervin and Representative Whitener, both strong critics of the 1964 Act. The amendment would have conditioned fund termination on a constitutional violation and would have defined "discrimination" under Title VI to require a showing of "affirmative intent to exclude." *Id.,* at 10062, 18701. Both sponsors stated that one purpose of their proposals was "to negate the application of purely mechanistic and statistical criteria in the determination of discrimination." *Id.,* at 10061 (Sen. Ervin); *id.,* at 18701 (Rep. Whitener). Proponents of the measure criticized the administrative guidelines that had been issued under the 1964 Act. *E. g., id.,* at 18703 (Rep. Landrum). Opponents of the measure asserted that it would constitute "a complete repealer of title VI," *ibid.* (Rep. Rodino), and that it "would gut title VI of the 1964 law." *Id.,* at 18705 (Rep. Kastenmeier).

[9] See 20 U. S. C. § 1681(a) (Title IX of the Education Amendments of 1972); 29 U. S. C. § 794 (Rehabilitation Act of 1973); 31 U. S. C. § 1242 (Revenue Sharing Act); 42 U. S. C. § 3766(c)(1) (Crime Control Act of 1973); 42 U. S. C. § 5309 (Housing and Community Development Act of 1976); 42 U. S. C. § 5672(b) (Juvenile Justice Act of 1974); 42 U. S. C. § 6102 (Age Discrimination Act); 42 U. S. C. § 6709 (Public Works Employment Act); 42 U. S. C. § 6870(a) (Energy Conservation and Resources Renewal Act of 1976); 45 U. S. C. § 803 (Railroad Revitalization and Regulatory Reform Act). Congress directed its attention to the Title VI

when dealing with congressional inaction, we have recognized that it is appropriate to attribute significance to such inaction where an administrative interpretation "involves issues of considerable public controversy," *United States* v. *Rutherford*, 442 U. S. 544, 554 (1979), and Congress has not acted to correct any misinterpretation of its objectives despite its continuing concern with the subject matter, *ibid.*

A contemporaneous and consistent construction of a statute by those charged with its enforcement combined with congressional acquiescence "creates a presumption in favor of the administrative interpretation, to which we should give great weight, *even if we doubted the correctness of the ruling of the Department . . . ." Costanzo* v. *Tillinghast*, 287 U. S. 341, 345 (1932) (emphasis added). Thus, in construing statutes, this Court has repeatedly sustained a reasonable administrative interpretation even if we would have reached a different result had the question initially arisen in a judicial proceeding. *FEC* v. *Democratic Senatorial Campaign Committee*, 454 U. S. 27, 39 (1981); *Red Lion Broadcasting Co.* v. *FCC*, 395 U. S. 367, 381 (1969); *Udall* v. *Tallman*, 380 U. S. 1, 16 (1965); *Unemployment Compensation Comm'n* v. *Aragon*, 329 U. S. 143, 153 (1946); *United States* v. *Alexander*, 12 Wall. 177, 179–181 (1871).

While not the only reasonable construction of the statute, the uniform administrative construction of Title VI is "far from unreasonable." *Zenith Radio Corp.* v. *United States*, 437 U. S., at 451. The Civil Rights Act was aimed at "eradicating significant areas of discrimination on a nationwide basis." H. R. Rep. No. 914, 88th Cong., 1st Sess., 18 (1963). The "[m]ost glaring" problem was "the discrimination against Negroes which exists throughout our Nation." *Ibid.* Given that Title VI was meant to remedy past dis-

---

regulations in enacting the Public Works Employment Act of 1976, which provides for enforcement "through agency provisions and rules similar to those already established, with respect to racial and other discrimination under title VI of the Civil Rights Act of 1964." 42 U. S. C. § 6709.

crimination against minorities, 438 U. S., at 285 (POWELL, J.); *id.*, at 328 (BRENNAN, WHITE, MARSHALL, and BLACK-MUN, JJ.), an "effects" test is a reasonable means of effectuating this goal. See *City of Rome* v. *United States*, 446 U. S. 156, 177 (1980) (ban on electoral changes having a discriminatory impact is an appropriate method of enforcing prohibition against intentional discrimination). In addition, when the agencies first interpreted the statute in 1964, 12 years before *Washington* v. *Davis*, 426 U. S. 229 (1976), the equal protection standard could easily have been viewed as one of discriminatory impact. See, *e. g.*, *Arnold* v. *North Carolina*, 376 U. S. 773 (1964) *(per curiam); Anderson* v. *Martin*, 375 U. S. 399 (1964).[10] Moreover, given the need for an objective and administrable standard applicable to thousands of federal grants under Title VI, the "effects" test is far more practical than a test that focuses on the motive of the recipient, which is typically very difficult to determine.[11]

The legislative history of Title VI fully confirms that Congress intended to delegate to the Executive Branch substantial leeway in interpreting the meaning of discrimination under Title VI. See Abernathy, Title VI and the Constitution: A Regulatory Model for Defining "Discrimination," 70 Geo. L. J. 1, 20–39 (1981). The word "discrimination" was nowhere defined in Title VI.[12] Instead, Congress authorized

---

[10] See also *Gomillion* v. *Lightfoot*, 364 U. S. 339 (1960); Perry, The Disproportionate Impact Theory of Racial Discrimination, 125 U. Pa. L. Rev. 540, 544 (1977) ("Considerable uncertainty existed prior to *Washington* in regard to whether the principal element of a constitutional claim of racial discrimination was discriminatory purpose or simply discriminatory effect"). Of course, even in *Washington* v. *Davis* the Court made clear that evidence of discriminatory impact may be highly probative of discriminatory intent, 426 U. S., at 242.

[11] See *Metropolitan Housing Development Corp.* v. *Village of Arlington Heights*, 558 F. 2d 1283, 1290 (CA7 1977) (discussing Title VIII), cert. denied, 434 U. S. 1025 (1978).

[12] See 110 Cong. Rec. 5612 (1964) (Sen. Ervin); *id.*, at 1619 (Rep. Abernethy); *id.*, at 1632 (Rep. Dowdy); *id.*, at 5251 (Sen. Talmadge); *id.*, at 6052 (Sen. Johnston).

executive departments and agencies to adopt regulations with the antidiscrimination principle of § 601 of the Act "as a general criterion to follow." Civil Rights: Hearings on H. R. 7152 before the House Committee on the Judiciary, 88th Cong., 1st Sess., 2740 (1963) (testimony of Attorney General Kennedy). Congress willingly conceded "[g]reat powers" to the Executive Branch in defining the reach of the statute. *Id.*, at 1520 (statement of Rep. Celler, Chairman of the House Judiciary Committee).[13] Indeed, the significance of the administrative role in the statutory scheme is underscored by the fact that Congress required the President to approve all Title VI regulations.[14]

In the face of a reasonable and contemporaneous administrative construction that has been consistently adhered to for nearly 20 years, originally permitted and subsequently acquiesced in by Congress, and expressly adopted by this Court in *Lau*, I would hold that Title VI bars practices that have a discriminatory impact and cannot be justified on legitimate grounds.[15] I frankly concede that our reasoning in *Bakke*

---

[13] See Civil Rights—the President's Program, 1963: Hearings before the Senate Committee on the Judiciary, 88th Cong., 1st Sess., 400 (1963) (colloquy between Sen. Ervin and Attorney General Kennedy); Civil Rights: Hearings on H. R. 7152 before the House Committee on the Judiciary, 88th Cong., 1st Sess., 2765–2766 (1963) (colloquy between Rep. Mathias and Attorney General Kennedy); *id.*, at 1890 (remarks of Rep. Celler); 110 Cong. Rec. 2498 (1964) (remarks of Rep. Selden); *id.*, at 12320 (remarks of Sen. Byrd).

[14] 42 U. S. C. § 2000d–1. See 110 Cong. Rec. 2499 (1964) (quoting amendment of Rep. Lindsay).

[15] Proof of the disproportionate racial impact of a program or activity is, of course, not the end of the case. Rather a prima facie showing of discriminatory impact shifts the burden to the recipient of federal funds to demonstrate a sufficient nondiscriminatory justification for the program or activity. See *Bryan* v. *Koch*, 627 F. 2d 612, 623 (CA2 1980) (Kearse, J., concurring in part and dissenting in part). In this case, respondents failed to provide an adequate justification.

I also agree with JUSTICE WHITE, *ante*, at 584, n. 2, that the administrative regulations are valid even assuming, *arguendo*, that Title VI itself does not proscribe disparate-impact discrimination.

was broader than it should have been. The statement that Title VI was "absolutely coextensive" with the Equal Protection Clause, 438 U. S., at 352, was clearly superfluous to the decision in that case. Whatever the precise relationship between Title VI and the Equal Protection Clause may be, it would have been perverse to construe a statute designed to ameliorate the plight of the victims of racial discrimination to prohibit recipients of federal funds from voluntarily employing race-conscious measures to eliminate the effects of past societal discrimination. *Id.*, at 336–350, 353–355 (opinion of BRENNAN, WHITE, MARSHALL, and BLACKMUN, JJ.).[16]

## II

While agreeing that the Court of Appeals erred in requiring proof of discriminatory intent, JUSTICE WHITE has addressed an alternative ground for affirming the Court of Appeals judgment. He concludes that compensatory relief should not be awarded to private Title VI plaintiffs in the absence of proof of discriminatory animus. I cannot agree.

## A

It is "well settled" that where legal rights have been invaded, "federal courts may use any available remedy to make good the wrong done." *Bell* v. *Hood*, 327 U. S. 678, 684 (1946). See, *e. g.*, *Sullivan* v. *Little Hunting Park*, 396 U. S. 229, 238–240 (1969); *Steele* v. *Louisville & Nashville R.*

---

[16] Although we recognized in *Bakke* that our reasoning cast serious doubts on *Lau*, we took pains to explain that our decision was fully consistent with *Lau*. See 438 U. S., at 353. Indeed, we noted that the existence of an impact standard "strongly supports the view that voluntary race-conscious remedial action is permissible under Title VI." *Ibid.* As we explained, "[i]f discriminatory racial impact alone is enough to demonstrate at least a prima facie Title VI violation, it is difficult to believe that the Title would forbid the Medical School from attempting to correct the racially exclusionary effects of its initial admissions policy during the first two years of the School's operation." *Ibid.*

*Co.*, 323 U. S. 192, 207 (1944) (courts have a "duty" to provide injunctive and damages remedies for violation of Railway Labor Act's command to represent union members without racial discrimination); *Deckert* v. *Independence Shares Corp.*, 311 U. S. 282, 288 (1940); *Texas & N. O. R. Co.* v. *Railway Clerks*, 281 U. S. 548, 569–570 (1930). In accord with *Bell* v. *Hood*, the Court has previously found no merit in "the contention that such remedies are limited to prospective relief." *J. I. Case Co.* v. *Borak*, 377 U. S. 426, 434 (1964). Cf. *Schine Theatres* v. *United States*, 334 U. S. 110, 128 (1948) (Court "start[s] from the premise" that an injunction against future violations of a statute is inadequate). The use of all available judicial remedies, including compensatory relief, is no less appropriate to redress discrimination in violation of Title VI. "Congress has legislated and made its purpose clear; it has provided enough federal law . . . from which appropriate remedies may be fashioned even though they rest on inferences. Otherwise we impute to Congress a futility inconsistent with the great design of this legislation." *United States* v. *Republic Steel Corp.*, 362 U. S. 482, 492 (1960). In Title VI actions, as in other private suits for violations of federal statutes, the federal judiciary may employ remedies "according to reasons related to the substantive social policy embodied in an act of positive law." *Bivens* v. *Six Unknown Federal Narcotics Agents*, 403 U. S. 388, 403, n. 4 (1971) (Harlan, J., concurring in judgment). See, *e. g., Sullivan* v. *Little Hunting Park, supra,* at 239; *Wyandotte Transportation Co.* v. *United States*, 389 U. S. 191, 202 (1967); *Sola Electric Co.* v. *Jefferson Electric Co.*, 317 U. S. 173, 176 (1942); *Deitrick* v. *Greaney*, 309 U. S. 190, 200–201 (1940).

Denying private plaintiffs the right to recover compensatory relief for all violations involving programs with a discriminatory effect would frustrate the fundamental purpose of Title VI. Section 601 unequivocally creates victims'

rights. But a right without an effective remedy has little meaning. See *Sullivan* v. *Little Hunting Park, supra,* at 238. As President Kennedy stated in his 1963 Message to Congress on Civil Rights, "[t]he venerable code of equity law commands 'for every wrong, a remedy.'" H. R. Doc. No. 124, 88th Cong., 1st Sess., 2 (1963). Noncompensatory relief by its very nature cannot "remedy" an injustice that has already occurred. A failure to correct adequately for individual violations depreciates the law, which was specifically intended to deal with "the injustices and humiliations of racial and other discrimination." H. R. Rep. No. 914, 88th Cong., 1st Sess., 18 (1963).

Indeed, the unavailability of a retrospective remedy may often result in the deprivation of *any* relief whatsoever. Many programs and activities receiving federal financial assistance, such as construction projects, are necessarily short in duration. By the time that a private plaintiff had successfully brought suit challenging discrimination in such a program, prospective relief could be a nullity. Cf., *e. g.,* *Norwalk CORE* v. *Norwalk Redevelopment Agency,* 395 F. 2d 920 (CA2 1968) (urban renewal project completed by the time the court recognized plaintiff's standing to sue).

Private retrospective relief also constitutes a "necessary supplement" to the administrative enforcement mechanism contained in Title VI. See *J. I. Case Co.* v. *Borak, supra,* at 432. The statutory sanction of a fund cutoff cannot sufficiently ensure general compliance with the command of Title VI, because the sheer quantity of federal financial assistance programs makes Government enforcement alone impractical[17] and because a fund cutoff is too Draconian to be widely

[17] See *Newman* v. *Piggie Park Enterprises, Inc.,* 390 U. S. 400, 401 (1968) ("When the Civil Rights Act of 1964 was passed, it was evident that enforcement would prove difficult and that the Nation would have to rely in part upon private litigation as a means of securing broad compliance with the law"). The Federal Government's actual performance under Title VI has been very inadequate. See *Brown* v. *Weinberger,* 417 F. Supp. 1215

used.[18]   Retrospective liability for Title VI violations complements administrative enforcement by providing a more realistic deterrent against unlawful behavior.   Moreover, the fund cutoff is no "remedy" at all for victims of past acts of discrimination because it merely assures that other innocent individuals will also be denied the benefits of federal assistance.[19]   Regardless of the alternative administrative sanction, individual acts of discrimination still violate the law and can be remedied only by compensatory relief.   Restricting relief to prospective remedies can only encourage recipients acting in bad faith to make no effort to comply with the statute and to stall private litigants in the knowledge that justice delayed will be justice denied.

B

"Unless a statute in so many words, or by a necessary and inescapable inference, restricts the court's jurisdiction in equity, the full scope of that jurisdiction is to be recognized and applied."   *Porter* v. *Warner Co.*, 328 U. S. 395, 398 (1946).   See *Mitchell* v. *Robert DeMario Jewelry, Inc.*, 361

(DC 1976); *Adams* v. *Weinberger*, 391 F. Supp. 269 (DC 1975); U. S. Commission on Civil Rights, The State of Civil Rights: 1977 (1978); U. S. Commission on Civil Rights, The State of Civil Rights: 1976 (1977); U. S. Commission on Civil Rights, The Federal Civil Rights Enforcement Effort (1970); Comptroller General, Agencies When Providing Federal Financial Assistance Should Ensure Compliance with Title VI (B–197815, Apr. 15, 1980); Wing, Title VI and Health Facilities: Forms Without Substance, 30 Hastings L. J. 137 (1978); Note, 65 Cornell L. Rev. 689, 692–695 (1980); Note, 85 Yale L. J. 721, 727–728 (1976); Comment, 36 Geo. Wash. L. Rev. 824 (1968).

[18] See, *e. g.*, Lamber, Private Causes of Action Under Federal Agency Nondiscrimination Statutes, 10 Conn. L. Rev. 859, 888, and n. 150 (1978) (because of "extreme and harsh" nature of the sanction, the Health, Education, and Welfare Department had terminated funding for only three educational institutions in 14 years).

[19] Congress itself noted that a cutoff was only to be a last resort after other devices, including lawsuits, failed.   See, *e. g.*, 110 Cong. Rec. 7067 (1964) (Sen. Ribicoff); *id.*, at 5090, 6544 (Sen. Humphrey); *id.*, at 7103 (Sen. Javits).

U. S. 288, 291–292 (1960). In enacting Title VI, Congress clearly did not choose to restrict relief to prospective or noncompensatory remedies.[20]

When Congress has intended to place restrictions on private rights of action in the Civil Rights Act of 1964, it has proved capable of saying so explicitly. For example, Title II provides that a court may defer action on a private suit by referring the case to the Community Relations Services. 42 U. S. C. § 2000a–3(d). Similarly, Title VII conditions a private action on the plaintiff's having first brought a claim before the Equal Employment Opportunity Commission. § 2000e *et seq.* (1976 ed. and Supp. V). But nothing in Title VI or in its history supports a restriction on a federal court's ability to remedy a statutory violation.

## C

JUSTICE WHITE attempts to justify the departure from well-established remedial principles by relying in large part on *Pennhurst State School and Hospital* v. *Halderman*, 451 U. S. 1 (1981). See *ante,* at 596–597. *Pennhurst* involved the Developmentally Disabled Assistance and Bill of Rights Act, 42 U. S. C. § 6000 *et seq.* (1976 ed. and Supp. V), a grant program through which the Federal Government provides funding to the States. The Court focused on § 111 of the Act, 42 U. S. C. § 6010, which states various rights of persons with developmental disabilities. "Noticeably absent" from the provision was "any language suggesting that

---

[20] By contrast, in *Transamerica Mortgage Advisors, Inc.* v. *Lewis,* 444 U. S. 11 (1979), see *ante,* at 595–596, the Investment Advisors Act had created an explicit remedy in one section, which precluded the implicit creation of a damages remedy. Title VI, by contrast, contains no explicit private remedy and the administrative remedy is clearly not exclusive. Similarly, in *Cannon* v. *University of Chicago,* 441 U. S. 677, 705–706 (1979), this Court rejected the notion that an administrative mechanism was the exclusive remedy under Title IX of the Education Amendments of 1972.

§ 6010 is a 'condition' for the receipt of federal funding." 451 U. S., at 13. This omission stood in stark contrast to other sections of the Act. Because receipt of federal funds was not conditioned on compliance with § 6010, the Court held that § 6010 imposed no enforceable rights or obligations. The Court analogized spending power legislation to a contract, stating that "if Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously." *Id.*, at 17.[21]

In contrast to the statutory provision in *Pennhurst*, Title VI of the Civil Rights Act unambiguously imposes a condition on the grant of federal moneys. Section 601 of Title VI states that "[n]o person . . . shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U. S. C. § 2000d. Recipients of federal financial assistance are automatically subject to the non-discrimination obligation imposed by the statute.

The statutory mandate can hardly escape notice. Every application for federal financial assistance must, "as a *condition* to its approval and the extension of any Federal financial assistance," contain assurances that the program will comply with Title VI *and* with all requirements imposed pursuant to

---

[21] Only in dicta did the Court also discuss the question of the appropriate remedy for violation of conditions contained in an Act. 451 U. S., at 29. Because the Court of Appeals had not even addressed the issue, this Court did not purport to resolve the remedial question but merely remanded the matter for further consideration. *Id.*, at 30. Similarly, in *Rosado* v. *Wyman*, 397 U. S. 397 (1970), the Court never addressed the propriety of retrospective relief because the plaintiffs had requested only declaratory and injunctive relief against enforcement of a state law. See *id.*, at 421. JUSTICE WHITE finds solace in *Rosado*, see *ante*, at 596–597, even though that decision emphasized the authority of a federal court to oversee use of federal funds in a private suit notwithstanding Congress had lodged in an executive department the power to cut off federal funds for noncompliance with statutory requirements. 397 U. S., at 420.

the executive regulations issued under Title VI.[22]   In fact, applicants for federal assistance literally sign contracts in which they agree to comply with Title VI and to "immediately take any measures necessary" to do so.   This assurance is given "in consideration of" federal aid, and the Federal Government extends assistance "in reliance on" the assurance of compliance.[23]   See 3 R. Cappalli, Federal Grants § 19:20, p. 57, and n. 12 (1982) (written assurances are merely a formality because the statutory mandate applies and is enforceable apart from the text of any agreement).

The obligation to comply with § 601 does not place upon a recipient unanticipated burdens because any recipient must anticipate having to comply with the law.   Certainly no applicant has a legitimate expectation that he can evade the statutory obligation and the expense that compliance may entail.   Indeed, in extending grants the United States has always retained an inherent right to sue for enforcement of the recipient's obligation.[24]   All traditional judicial remedies can

---

[22] See 7 CFR § 15.4 (1982) (Dept. of Agriculture); 15 CFR § 8.5 (1982) (Dept. of Commerce); 32 CFR § 300.6 (1982) (Dept. of Defense); 34 CFR § 100.4 (1982) (Dept. of Education); 10 CFR § 1040.4 (1982) (Dept. of Energy); 45 CFR § 80.4 (1982) (Dept. of Health and Human Services); 24 CFR § 1.5 (1982) (Dept. of Housing and Urban Development); 43 CFR § 17.4 (1982) (Dept. of the Interior); 28 CFR § 42.105 (1982) (Dept. of Justice); 29 CFR § 31.6 (1982) (Dept. of Labor); 22 CFR § 141.4 (1982) (Dept. of State); 49 CFR § 21.7 (1982) (Dept. of Transportation); 31 CFR § 51.59 (1982) (Dept. of Treasury).

[23] See, e. g., Assurance of Compliance with the Department of Health, Education, and Welfare Regulation under Title VI of the Civil Rights Act of 1964, reprinted in 3 R. Cappalli, Federal Grants, Appendix 19–G (1982).

[24] E. g., Rex Trailer Co. v. United States, 350 U. S. 148, 151 (1956); United States v. San Francisco, 310 U. S. 16, 31 (1940); Cotton v. United States, 11 How. 229, 231 (1851); Dugan v. United States, 3 Wheat. 172, 181 (1818).   As this Court once said with respect to a grant of lands by the Federal Government to a State:

"It is not doubted that the grant by the United States to the State upon conditions, and the acceptance of the grant by the State, constituted a contract.   All the elements of a contract met in the transaction,—competent

be applied in such situations.[25]   This right to sue is equally applicable to Title VI.   See 42 U. S. C. § 2000h–3.   For example, in *United States* v. *Marion County School Dist.*, 625 F. 2d 607 (CA5 1980), the court concluded "that the United States is entitled to sue to enforce contractual assurances of compliance with Title VI's prohibition against discrimination in the operation of federally-funded schools, and that the United States is entitled to whatever relief is necessary to enforce such assurances, including 'transportation relief.'" *Id.*, at 617.[26]

---

parties, proper subject-matter, sufficient consideration, and consent of minds.   This contract was binding upon the State." *McGee* v. *Mathis*, 4 Wall. 143, 155 (1866).

[25] See, *e. g.*, *Rex Trailer Co.* v. *United States, supra,* at 151; *United States* v. *Stevenson*, 215 U. S. 190, 197 (1909); *Cotton* v. *United States, supra,* at 231; *Dugan* v. *United States, supra,* at 181.

[26] Accord, *e. g.*: *Brown* v. *Califano*, 201 U. S. App. D. C. 235, 246, 627 F. 2d 1221, 1232 (1980); *United States* v. *Tatum Independent School Dist.*, 306 F. Supp. 285, 288 (ED Tex. 1969); *United States* v. *Frazer*, 297 F. Supp. 319 (MD Ala. 1968), 317 F. Supp. 1079 (MD Ala. 1970) (broad remedial order); *United States* v. *Board of Education*, 295 F. Supp. 1041 (SD Ga. 1969).   See also, *e. g.*, *United States* v. *Harrison County, Miss.*, 399 F. 2d 485 (CA5 1968), cert. denied, 397 U. S. 918 (1970); *United States* v. *County School Bd.*, 221 F. Supp. 93 (ED Va. 1963).   The Civil Rights Act of 1964 itself provides for compliance by any other lawful means and for suits by the Government.   § 602, 42 U. S. C. § 2000d–1; § 1103, 42 U. S. C. § 2000h–3.   See 110 Cong. Rec. 7060 (1964) (Sen. Pastore) (agency may sue to enforce contractual nondiscrimination requirement); *id.*, at 7066 (Sen. Ribicoff) (calling such a suit "the most effective way for an agency to proceed").   Shortly after the Act was passed, agencies charged with its execution confirmed the availability of governmental suits to enforce Title VI.   *E. g.*, 29 Fed. Reg. 16301 (1964) (HEW).   See 31 Fed. Reg. 5292 (1966) (Department of Justice Guidelines for Enforcement of Title VI) ("Possibilities of judicial enforcement include (1) a suit to obtain specific enforcement of assurances . . .").   Indeed, even before enactment of the Civil Rights Act of 1964, the President had asserted authority to impose nondiscrimination obligations on the extension of certain forms of federal financial assistance.   See Exec. Order No. 10925, 3 CFR 448 (1959–1963 Comp.); Exec. Order No. 11114, 3 CFR 774 (1959–1963 Comp.).   Title VI resolved any questions about the President's authority to enforce such

When respondents requested, received, and expended federal funds to pay the salaries of policemen and trainees and to finance recruitment programs, 466 F. Supp. 1273, 1281 (SDNY 1979), their duty not to discriminate was manifest. The obligation to comply with the law attached at the time respondents agreed to take federal money, not when the District Court concluded that respondents had violated the law. Thus, the District Court properly provided a remedy for *past* failure to carry out the statutory obligation. The relief fashioned by the District Court requires respondents to remedy their failure to shoulder the burden that existed from the moment they received federal funding.

The analogy drawn in *Pennhurst* between the acceptance of funds under spending legislation and the formation of a contract only reinforces the propriety of awarding retrospective relief. Having benefited from federal financial assistance conditioned on an obligation not to discriminate, recipients of federal aid must be held to their part of the bargain. Yet, JUSTICE WHITE would allow recipients to violate the conditions of their contracts until a court identifies the violation and either enjoins its continuance or orders the recipient to begin performing its duties incident to the receipt of federal money. See *ante,* at 602–603. This is surely a bizarre view of contract law.[27]

Only by providing retrospective relief to private litigants can the courts fulfill the terms of the "contract" between the

---

obligations since it was undisputed that Congress had the constitutional power to attach reasonable conditions under the Spending Clause. See 3 R. Cappalli, *supra,* § 19:14, at 38.

[27] JUSTICE WHITE notes that the Federal Government can sue recipients who fail to comply with grant agreements and force the violators to repay funds. See *ante,* at 603, n. 24. But this merely demonstrates that recipients do not have any legitimate expectations that only limited injunctive relief is available as a remedy for violations of the statute. Moreover, the grant agreements under Title VI specifically mention compliance with the executive regulations, which unambiguously incorporate an effects standard.

Federal Government and recipients of federal financial assistance. In exchange for federal moneys, recipients have promised not to discriminate. Because Title VI is intended to ensure that "no person" is subject to discrimination in federally assisted programs, private parties function as third-party beneficiaries to these contracts. *Lau* v. *Nichols*, 414 U. S., at 571, n. 2 (Stewart, J., concurring in result). See Restatement (Second) of Contracts § 304 (1981). When a court concludes that a recipient has breached its contract, it should enforce the broken promise by protecting the expectation that the recipient would not discriminate. See *id.* § 344, Comment *a.* The obvious way to do this is to put private parties in as good a position as they would have been had the contract been performed. This requires precisely the kind of make-whole remedy that JUSTICE WHITE rejects, see *ante*, at 602–603, despite his accurate characterization of Title VI as a " 'contractual' spending-power provision," *ante*, at 599.[28]

---

[28] JUSTICE WHITE's approach is also fraught with the serious difficulties inherent in attempting to classify relief as either retrospective or prospective. For example, Judge Meskill thought that the order that a new sergeant's examination be given was prospective and noncompensatory, 633 F. 2d, at 255–256, n. 43, but JUSTICE WHITE adopts the contrary position, *ante*, at 605, 606. Judge Coffrin thought that constructive seniority was noncompensatory. "This court should not view such a remedy as retrospective compensation for past harm simply because the judicial process takes time." 633 F. 2d, at 274, n. 2 (concurring). JUSTICE WHITE obviously disagrees, *ante*, at 606.

JUSTICE WHITE rests his analysis on *Edelman* v. *Jordan*, 415 U. S. 651, 667 (1974), see *ante*, at 604. But Eleventh Amendment considerations have absolutely no relevance to this case because respondents are not state but rather municipal entities. See *Mt. Healthy City School Dist. Bd. of Education* v. *Doyle*, 429 U. S. 274, 280 (1977) (local governments have no immunity against retroactive liability). Even accepting the relevance of *Edelman*, the resulting characterizations of the relief in this case are questionable. For instance, the order placing the police officers who were victims of discrimination in the position on the seniority roster that they would have occupied but for the discriminatory examinations certainly alters their employment status for the future. Just because a program is also "compensatory" in nature is clearly not controlling under the Eleventh

## D

For the foregoing reasons, I would hold that a court has broad discretion to remedy violations of Title VI in actions brought by private parties.   Of course, in determining appropriate relief, a court must exercise its discretion equitably.   This requires consideration of a myriad of factors including the potential for unreasonable hardship to the party in breach, the extent of mitigation, and the like.   The details of the relief would normally be best left to the sound judgment of the District Court.   As the District Court noted, remedies adopted in Title VII suits provide a useful guidepost.   466 F. Supp., at 1287; see also *Association Against Discrimination* v. *City of Bridgeport*, 479 F. Supp. 101, 112 (Conn. 1979).   In my view, the relief ordered by the District Court in this case was entirely appropriate.

## III

Because the relief petitioners received was available to them under Title VI, and because that relief was justified without proof of discriminatory intent, I would reverse the judgment of the Court of Appeals.   Accordingly, I dissent.

---

Amendment.   In considering compensatory and remedial educational programs in *Milliken* v. *Bradley*, 433 U. S. 267 (1977), we stated:

"That the programs are also 'compensatory' in nature does not change the fact that they are part of a plan that operates *prospectively* to bring about the delayed benefits of a unitary school system.   We therefore hold that such prospective relief is not barred by the Eleventh Amendment."   *Id.*, at 290 (emphasis in original) (footnote omitted).

Finally, even if the Eleventh Amendment applied, the relief would not necessarily be inappropriate.   In *Parden* v. *Terminal R. Co.*, 377 U. S. 184 (1964), we held that by choosing to operate a railroad, Alabama became subject to duties imposed by the Federal Employers' Liability Act, and could be held liable in an action for damages for violations of these duties. A similar analysis could be applied with respect to the receipt of federal funds.

JUSTICE STEVENS, with whom JUSTICE BRENNAN and JUSTICE BLACKMUN join, dissenting.

It is not an easy task to harmonize the Court's cases under Title VI of the Civil Rights Act of 1964, 78 Stat. 252, as amended, 42 U. S. C. § 2000d *et seq.* (1976 ed. and Supp. V). Unless the Court is to repudiate what it has already written, however, I believe the judgment of the Court of Appeals must be reversed. I reach this conclusion by answering three separate questions: (1) whether federal law authorizes private individuals to recover damages for injuries caused by violations of Title VI and the regulations promulgated thereunder; (2) if so, whether Title VI requires recipients of federal funds to do any more than refrain from engaging in conduct that would, if performed by a State, violate the Fourteenth Amendment; and (3) if not, whether an administrative agency may validly impose additional requirements on recipients of funds from that agency. I shall discuss each question in turn.

I

In the last five years at least eight Members of this Court have endorsed the view that Title VI, as well as the comparable provisions of Title IX of the Education Amendments of 1972, may be enforced in a private action against recipients of federal funds, such as the respondents in this case.[1] This

---

[1] Six Members of the Court—CHIEF JUSTICE BURGER, JUSTICE BRENNAN, Justice Stewart, JUSTICE MARSHALL, JUSTICE REHNQUIST, and JUSTICE STEVENS—endorsed the view that a private right of action exists directly under Title VI and Title IX. *Cannon* v. *University of Chicago,* 441 U. S. 677 (1979); *University of California Regents* v. *Bakke,* 438 U. S. 265, 418–421 (1978) (STEVENS, J., joined by BURGER, C. J., and Stewart and REHNQUIST, JJ., dissenting). Two Members of the Court—JUSTICE WHITE and JUSTICE BLACKMUN—endorsed the view that private individuals may enforce Title VI and Title IX against appropriate defendants under 42 U. S. C. § 1983. *Cannon, supra,* at 722–724 (WHITE, J., joined by BLACKMUN, J., dissenting).

Court has authorized relief in at least four such cases. *Lau* v. *Nichols,* 414 U. S. 563 (1974); *Hills* v. *Gautreaux,* 425 U. S. 284 (1976); *University of California Regents* v. *Bakke,* 438 U. S. 265 (1978); *Cannon* v. *University of Chicago,* 441 U. S. 677 (1979).

JUSTICE WHITE suggests that some plaintiffs who prevail in suits under Title VI are entitled only to a limited form of prospective relief.[2] That suggestion is somewhat surprising, since no Member of the Court in *Lau, Bakke,* or *Cannon* mentioned such a limitation on remedies. Presumably, it rests on a belief that Congress, in enacting Title VI, intended to distinguish between prospective and retroactive relief. Yet it seems to me most improbable that Congress contemplated so significant and unusual a limitation on the forms of relief available to a victim of racial discrimination, but said absolutely nothing about it in the text of the statute. It is one thing to conclude, as the Court did in *Cannon,* that the 1964 Congress, legislating when implied causes of action were the rule rather than the exception, reasonably assumed that the intended beneficiaries of Title VI would be able to vindicate their rights in court. It is quite another thing to believe that the 1964 Congress substantially qualified that assumption but thought it unnecessary to tell the Judiciary about the qualification.

In reaching his novel conclusion about the scope of available relief under Title VI, JUSTICE WHITE relies heavily on the proposition that *Pennhurst State School and Hospital* v. *Halderman,* 451 U. S. 1 (1981), establishes a "presumption that only limited injunctive relief should be granted as a remedy for violations of statutes passed pursuant to the spending power." *Ante,* at 602. That characterization seriously distorts the opinion of the Court in *Pennhurst,* which concerned the existence or nonexistence of statutory rights, not reme-

---

[2] He limits his analysis to situations where no discriminatory intent is shown. *Ante,* at 597.

dies.[3]  We held that Congress will not be presumed to have created substantive legal obligations under the spending power by legislation so ambiguous that "a State is unaware of the conditions or is unable to ascertain what is expected of it."  451 U. S., at 17.[4]  In dictum,[5] we went on to speculate that an injunction requiring a State to provide "'appropriate' treatment in the 'least restrictive' environment" might be improper, noting that the Eleventh Amendment prohibits federal courts from requiring States to pay money damages. *Id.*, at 29–30.  Without explaining why, JUSTICE WHITE divines a general principle of statutory interpretation from this discussion of the Eleventh Amendment.  The Eleventh Amendment obviously has no relevance in most Title VI litigation; it certainly is not implicated in this suit against the

---

[3] We framed our opinion as follows:

"Petitioners first contend that 42 U. S. C. § 6010 does not create in favor of the mentally retarded any substantive rights to 'appropriate treatment' in the 'least restrictive' environment.  Assuming that Congress did intend to create such a right, petitioners question the authority of Congress to impose these affirmative obligations on the States under either its spending power or § 5 of the Fourteenth Amendment.  Petitioners next assert that any rights created by the Act are enforceable in federal court only by the Federal Government, not by private parties.  Finally, petitioners argue that the court below read the scope of any rights created by the Act too broadly and far exceeded its remedial powers in requiring the Commonwealth to move its residents to less restrictive environments and create individual habilitation plans for the mentally retarded.  *Because we agree with petitioners' first contention—that § 6010 simply does not create substantive rights—we find it unnecessary to address the remaining issues.*" 451 U. S., at 10–11 (emphasis added).

[4] Obviously, there can be no argument that the respondent Police Department in this case was unaware of its obligations.  Both the statute and the regulations clearly prohibit racial discrimination, and they did so at the time the respondent accepted the federal money.

[5] After the sentence fragment quoted *ante*, at 597, the Court concluded: "These are all difficult questions.  Because the Court of Appeals has not addressed these issues, however, we remand the issues for consideration in light of our decision here."  451 U. S., at 30.

officials and agencies of the City of New York. I cannot fathom the supposition that Congress regularly analogizes to the Eleventh Amendment when it drafts spending power legislation. There is certainly nothing in the text or the legislative history of Title VI to suggest that the 1964 Congress did so.

Even if it were not settled by now that Title VI authorizes appropriate relief, both prospective and retroactive, to victims of racial discrimination at the hands of recipients of federal funds, the same result would follow in *this* case because the petitioners have sought relief under 42 U. S. C. § 1983. While Title VI applies to all recipients of federal funds, § 1983 governs a different class of persons: those who act "under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory." Our past decisions establish that respondent Police Department in this case is bound by § 1983 as well as by Title VI. *Monell* v. *New York City Dept. of Social Services*, 436 U. S. 658 (1978). Our past decisions also establish that § 1983 provides a damages remedy. *Ibid.* And finally, it is clear that the § 1983 remedy is intended to redress the deprivation of rights secured by all valid federal laws, including statutes and regulations having the force of law. See *Maine* v. *Thiboutot*, 448 U. S. 1 (1980).[6] See also *Cannon*, 441 U. S., at 722–724 (WHITE, J., dissenting); *ante*, at 594, n. 17.

The policy arguments JUSTICE WHITE advances in support of his position may be perfectly sound. There may well be situations in which one would fear that strict retroactive enforcement of a federal grant condition would discourage grant applications that are a high federal priority.[7] These are,

---

[6] *Thiboutot* itself involved only federal statutes, not regulations. Its analysis of § 1983, however, applies equally to administrative regulations having the force of law. See *Chrysler Corp.* v. *Brown*, 441 U. S. 281, 301–303 (1979) (discussing what types of administrative regulations have "the force and effect of law").

[7] I must point out, however, that the record in this case gives no basis for thinking that the cost of an appropriate award of damages to the petitioners would exceed the total amount of respondents' federal subsidy. And, as a general proposition, it is usually assumed that a cutoff of federal

however, arguments that should be addressed to Congress rather than to a court, cf. *Cannon*, 441 U. S., at 709–710, since Congress has already implicitly authorized the Federal Judiciary to award appropriate relief to private parties injured by violations of Title VI. Whether these petitioners are within that special class is, of course, another question to which I now turn.

## II

In *University of California Regents* v. *Bakke*, 438 U. S., at 412–418, four Justices expressed the opinion that Title VI's prohibition against racial discrimination is significantly broader than the protection provided by the Equal Protection Clause of the Fourteenth Amendment. That position was a dissenting one, however; five Members of the Court unequivocally rejected it.

In his opinion announcing the judgment of the Court, JUSTICE POWELL reviewed the legislative history of Title VI and concluded:

> "In view of the clear legislative intent, Title VI must be held to proscribe only those racial classifications that would violate the Equal Protection Clause or the Fifth Amendment." *Id.*, at 287.

JUSTICE BRENNAN, JUSTICE WHITE, JUSTICE MARSHALL, and JUSTICE BLACKMUN reached the same conclusion. They wrote:

> "In our view, Title VI prohibits only those uses of racial criteria that would violate the Fourteenth Amendment if employed by a State or its agencies. . . ." *Id.*, at 328.[8]

---

funds would be significantly more drastic than an individualized remedy for the victim of a Title VI violation. See *Cannon*, 441 U. S., at 705, and n. 38.

[8] Accord, 438 U. S., at 332, 333, 334, n. 11, 336, 338. Towards the end of their opinion, JUSTICES BRENNAN, WHITE, MARSHALL, and BLACKMUN expressly considered and rejected the argument that the Court's earlier decision in *Lau* v. *Nichols*, 414 U. S. 563 (1974), foreclosed their reading of Title VI. See 438 U. S., at 352–353.

Later in their opinion, they summarized the reasoning that led them to that conclusion:

> "Congress' equating of Title VI's prohibition with the commands of the Fifth and Fourteenth Amendments, its refusal precisely to define that racial discrimination which it intended to prohibit, and its expectation that the statute would be administered in a flexible manner, compel the conclusion that Congress intended the meaning of the statute's prohibition to evolve with the interpretation of the commands of the Constitution." *Id.,* at 340.[9]

The interpretation of Title VI adopted by a majority in *Bakke* was confirmed in two subsequent opinions of the Court. In *Steelworkers* v. *Weber,* 443 U. S. 193, 206, n. 6 (1979), the Court distinguished Title VII from Title VI on the basis that the former provision "was not intended to incorporate and particularize the commands of the Fifth and Fourteenth Amendments."[10] And in *Board of Education, New York City* v. *Harris,* 444 U. S. 130 (1979), the Court first concluded that the 1972 Emergency School Aid Act (ESAA), 86 Stat. 354, contemplates funding cutoffs in response to

---

[9] Of course, in *Washington* v. *Davis,* 426 U. S. 229 (1976), the Court held that the Fourteenth Amendment is violated only by *purposeful* state racial discrimination.

[10] The Court explained:

"Title VI of the Civil Rights Act of 1964, considered in *University of California Regents* v. *Bakke,* 438 U. S. 265 (1978), contains no provision comparable to § 703(j) [of Title VII]. This is because Title VI was an exercise of federal power over a matter in which the Federal Government was already directly involved: the prohibitions against race-based conduct contained in Title VI governed 'program[s] or activit[ies] receiving Federal financial assistance.' 42 U. S. C. § 2000d. Congress was legislating to assure federal funds would not be used in an improper manner. Title VII, by contrast, was enacted pursuant to the commerce power to regulate purely private decisionmaking and was not intended to incorporate and particularize the commands of the Fifth and Fourteenth Amendments. Title VII and Title VI, therefore, cannot be read *in pari materia.*" 443 U. S., at 206, n. 6.

forms of discrimination that are not "discrimination in the Fourteenth Amendment sense." 444 U. S., at 149. The Court then went on, in considered dictum, to distinguish the ESAA from Title VI:

> "A violation of Title VI may result in a cutoff of all federal funds, and it is likely that Congress would wish this drastic result only when discrimination is intentional. In contrast, only ESAA funds are rendered unavailable when an ESAA violation is found." *Id.*, at 150.[11]

The question to be decided today is not whether the Court has misread the actual intent of the Congress that enacted the Civil Rights Act of 1964. For when the Court unequivocally rejects one reading of a statute, its action should be respected in future litigation. Compare *United States* v. *Board of Comm'rs of Sheffield, Ala.*, 435 U. S. 110, 140–150 (1978) (STEVENS, J., dissenting), with *Dougherty County Board of Education* v. *White*, 439 U. S. 32, 47 (1978) (STEVENS, J., concurring), and *City of Rome* v. *United States*, 446 U. S. 156, 191 (1980) (STEVENS, J., concurring). See also *Runyon* v. *McCrary*, 427 U. S. 160, 189–192 (1976) (STEVENS, J., concurring). If a statute is to be amended after it has been authoritatively construed by this Court, that task should almost always be performed by Congress.[12]

---

[11] In his dissenting opinion, Justice Stewart, joined by JUSTICES POWELL and REHNQUIST, also noted that Title VI "has been construed to contain not a mere disparate-impact standard, but a standard of intentional discrimination." 444 U. S., at 159–160.

[12] Like most, this proposition of law is not wholly without exceptions. Congress phrased some older statutes in sweeping, general terms, expecting the federal courts to interpret them by developing legal rules on a case-by-case basis in the common-law tradition. One clear example of such a statute is the Sherman Act, 26 Stat. 209. See *National Society of Professional Engineers* v. *United States*, 435 U. S. 679, 687–688 (1978); *Associated General Contractors of California, Inc.* v. *Carpenters*, 459 U. S. 519, 531–535 (1983). For that reason, in *Continental T. V., Inc.* v. *GTE Sylvania Inc.*, 433 U. S. 36 (1977), the doctrine of *stare decisis* did not preclude the Court from overruling its prior decision in *United States* v. *Arnold, Schwinn & Co.*, 388 U. S. 365 (1967), even though Congress had

Title VI must therefore mean what this Court has said it means, regardless of what some of us may have thought it meant before this Court spoke. Today, proof of invidious purpose is a necessary component of a valid Title VI claim.

## III

The respondent Police Department in this case sought, received, and expended federal grants to pay the salaries of policemen and to finance its recruitment programs. In order to obtain funds from the Department of Labor, the Department of Justice, and the Department of Housing and Urban Development, see App. A123, it was required to promise not only that it would comply with Title VI, but also that it would abide by departmental regulations implementing that statute.[13] Ever since 1964, all three Departments have had virtually identical implementing regulations. Significantly, those regulations do more than merely prohibit grant recipients from administering the funds with a discriminatory purpose; they require recipients to administer the grants in a manner that has no racially discriminatory *effects*.[14]

---

not acted during the intervening decade. Cf. *Monell* v. *New York City Dept. of Social Services*, 436 U. S. 658, 695–701 (1978) (overruling an erroneous interpretation of § 1983 in *Monroe* v. *Pape*, 365 U. S. 167 (1961), despite the absence of congressional action). Title VI is different from those statutes, because Congress expected most interstitial lawmaking to be performed by administrative agencies, not courts.

[13] One standard application form requires the following certification:

"The grantee hereby assures and certifies that it will comply with the regulations, policies, guidelines and requirements with respect to the acceptance and use of Federal funds for this federally-assisted program. Also, the grantee gives assurances and certifies with respect to the grant that:

.     .     .     .     .

"(6) The grant will be conducted and administered in compliance with:

"(a) Title VI of the Civil Rights Act of 1964 (Pub. L. 88–352) *and implementing regulations* . . . ." Form HUD 4124 (emphasis added).

[14] For example, the regulations provide:

"A recipient, in determining the . . . benefits which will be provided under any such program, . . . may not, directly or through contractual or other

This Court has repeatedly upheld the validity of those regulations and their "effects" standard. *Lau* v. *Nichols*, 414 U. S., at 568; *id.*, at 571 (Stewart, J., concurring); *Fullilove* v. *Klutznick*, 448 U. S. 448, 479 (1980) (opinion of BURGER, C. J.). The reason is that Title VI explicitly authorizes "[e]ach Federal department and agency which is empowered to extend Federal financial assistance . . . to effectuate the provisions of section 601 . . . by issuing rules, regulations, or orders of general applicability which shall be consistent with achievement of the objectives of the statute authorizing the financial assistance . . . ." 78 Stat. 252, 42 U. S. C. § 2000d–1. Nothing in the regulations is inconsistent with any of the statutes authorizing the disbursement of the grants that the respondent Police Department received.[15]

It is well settled that when Congress explicitly authorizes an administrative agency to promulgate regulations implementing a federal statute that governs completely private conduct, those regulations have the force of law so long as they are "reasonably related to the purposes of the enabling legislation." *Mourning* v. *Family Publications Service, Inc.*, 411 U. S. 356, 369 (1973). See also *Chrysler Corp.* v. *Brown*, 441 U. S. 281, 301–306 (1979); *Batterton* v. *Francis*, 432 U. S. 416, 425, n. 9 (1977). See generally K. Davis, Administrative Law Treatise § 7.8 (2d ed. 1980 and Supp. 1982). The presumption of validity must be at least as strong when a regulation does not seek to control the conduct of independent private parties, but merely defines the terms on which someone may seek federal money. By prohibiting grant recipients from adopting procedures that deny program benefits to members of any racial group, the administrative

---

arrangements, utilize criteria . . . which . . . have the effect of defeating or substantially impairing accomplishment of the objectives of the program as respect to persons of a particular race, color, or national origin." 24 CFR § 1.4(b)(2) (1982); 28 CFR § 42.104(b)(2) (1982); 29 CFR § 31.3(b)(2) (1982).

[15] Indeed, even in the absence of Title VI, one would expect the administrative agencies to distribute the grants in a way that will benefit all segments of the communities they seek to serve.

agencies have acted in a reasonable manner to further the purposes of Title VI.[16]

The reasonableness of the agencies' method of implementation is apparent from the Court's opinion in *City of Rome* v. *United States*, 446 U. S., at 173–178, which held that even if § 1 of the Fifteenth Amendment only prohibits purposeful racial discrimination in voting, Congress may implement that prohibition by banning voting practices that are discriminatory in effect. At the dawn of this century, this Court unanimously held that an administrative regulation's conformity to statutory authority was to be measured by the same standard as a statute's conformity to constitutional authority. In *Boske* v. *Comingore*, 177 U. S. 459, 470 (1900), we wrote:

> "In determining whether the regulations promulgated by [the Secretary of the Treasury] are consistent with law, we must apply the rule of decision which controls when an act of Congress is assailed as not being within the powers conferred upon it by the Constitution; that is to say, a regulation adopted under section 161 of the Revised Statutes should not be disregarded or annulled unless, in the judgment of the court, it is plainly and palpably inconsistent with law. Those who insist that such a regulation is invalid must make its invalidity so manifest that the court has no choice except to hold that the Secretary has exceeded his authority and employed means that are not at all appropriate to the end specified in the act of Congress."

Since an "effects" standard is an appropriate means for Congress to implement a constitutional prohibition against discrimination, an "effects" regulation is an equally appropriate

---

[16] Those purposes are evident from the statutory language:

"No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in [or] be denied the benefits of . . . any program or activity receiving Federal financial assistance." 78 Stat. 252, 42 U. S. C. § 2000d.

means for an administrative agency to implement a comparable statutory prohibition.[17]

Thus, although the petitioners had to prove that the respondents' actions were motivated by an invidious intent in order to prove a violation of the statute, they only had to show that the respondents' actions were producing discriminatory effects in order to prove a violation of valid federal law.

## IV

The District Court found that the respondent Police Department in this case was making entry-level appointments in a manner that had a discriminatory impact on blacks and Hispanics. That conduct violated the petitioners' rights under regulations promulgated by the Department of Labor, the Department of Justice, and the Department of Housing and Urban Development. The petitioners were therefore entitled to the compensation they sought under 42 U. S. C. § 1983 and were awarded by the District Court.[18] I would reverse the judgment of the Court of Appeals.

---

[17] Earlier in the *Boske* opinion the Court had noted that there was "certainly no statute which expressly or by necessary implication forbade the adoption of such a regulation." 177 U. S., at 469. The same may be said of the regulations at issue in this case. For although the Court has determined that Title VI does not *compel* the application of an effects standard, see *supra*, at 639–642, I do not believe that Congress should be understood to have *prohibited* regulations adopting such a standard, especially given the passages from the legislative history of Title VI identified in *Bakke*, 438 U. S., at 413–418, nn. 11, 13, 15, 16, 19, 23 (STEVENS, J., dissenting), and Congress' acquiescence in those regulations since 1964.

[18] Because respondent Police Department acted under color of state law in making appointments, § 1983 authorizes a lawsuit against it, based on its violation of the governing administrative regulations. This does not mean, as JUSTICE POWELL suggests, *ante*, at 608, n. 1, that a similar action would be unavailable against a similarly situated private party. Whether a cause of action against private parties exists directly under the regulations and, if so, what the standard of liability in such an action would be, are questions that are not presented by this case.